**BORDEN CO. et al. v. LOCAL NO. 133 OF INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, STABLEMEN, AND HELPERS OF AMERICA et al.**

**No. 11227.**

Court of Civil Appeals of Texas. Galveston.
April 10, 1941.

Rehearing Denied May 29, 1941.

Tom M. Davis, of Houston (Baker, Botts, Andrews & Wharton, of Houston, of counsel), for appellee Sam Person and appellant Borden Co.

Combs & Dixie, of Houston (W. A. Combs of Houston, of counsel), for Local No. 133, International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, L. A. Rankin, and Frank Prohl, both appellees and appellants.

MONTEITH, Chief Justice.

This is an appeal from an order of the district court of Harris County granting the application of Sam Person, doing business as Brazos Ice Company, for a temporary injunction restraining Local 133 of International Brotherhood of Teamsters, Chauffeurs, Stablemen, and Helpers of America and its members, hereinafter called defendants, from picketing his place of business, and denying an application of the Borden Company for a temporary injunction restraining defendants from picketing its customers.

At the request of the Borden Company, the trial court filed findings of fact and conclusions of law. The Borden Company excepted to certain of said findings.

The court found, on what we deem to be sufficient evidence, that Sam Person conducted a retail business in the City of Houston in which he sold various articles, including milk purchased from the Borden Company, and that he had developed a substantial patronage and good will; that he employed three men in the conduct of his business, all of whom were members of the Ice Handlers Union with which he had a contract covering his employees, and that his employees were not members of or eligible for membership in defendant union and that there was no dispute of any kind between him and the Ice Handlers Union or any of his employees, and that neither he nor any of his employees had a labor dispute of any kind with defendant union. It found that in January, 1941, defendant union, acting through its representatives, requested Person to discontinue the sale of milk processed by the Borden Company, and that upon his refusal to do so, defendant union caused his place of business to be picketed; that the pickets moved slowly back and forth on the sidewalk in front of his place of business carrying a large cardboard sign on which was printed: "This place is selling milk from dairies who locked out their employees. Milk Drivers Union 133. Affiliated with A. F. of L." The court found that the picketing in question was not picketing of Person's place of business as such, but was the picketing only of the dairy-products purchased by Person from the Borden Company; that said Pickets conducted themselves in an orderly, proper and peaceful manner, though at times customers were required to bring their cars to a stop, to permit the picket to pass, before driving in. It was found that during the time Person's place of business was picketed his loss in gross receipts was from $10 to $15 per day. The court found that the picketing of Person's place of business will continue to cause him irreparable damage and he has no adequate remedy at law, since defendant union has no property of any kind and is unable to respond in damages.

The court found that defendant union had a bona fide labor dispute with the Borden Company relative to the operation of its business and plant in Houston, but that no labor dispute of any kind existed between it and any of the Borden Company's customers, the picketing of whom was sought to be enjoined; that in January, 1941, it caused the places of business of four customers of the Borden Company, including the Brazos Ice Company, to be picketed by means of pickets carrying the cardboard sign hereinabove referred to; that threats

of picketing and picketing by defendant union had caused the Borden Company to suffer damages, the amount of which is unascertainable.

The court concluded as a matter of law that the injunction sought by the Borden Company should be denied for the reason that its customers whose place of business it sought to enjoin defendant union from picketing, with the exception of the Brazos Ice Company, conducted by Sam Person, had not been made parties to the suit and were not specifically named either in the Borden Company's pleadings or in the evidence on the trial of the suit, and that an injunction, if granted, would be too vague for lack of proper description of the customers which defendant union would be enjoined from picketing in the event the Borden Company's application for an injunction was granted.

The question presented in this appeal has not heretofore been passed on by an appellate court of this state. It involves the right of a court of equity to enjoin a labor organization from picketing the place of business of a retailer with whom the union has no labor dispute nor any other connection or association, by means of placards carried by pickets expressing the union's views upon a situation affecting its members for the admitted purpose of preventing the sale of a product purchased by the retailer from a manufacturer with whom the union has a bona fide labor dispute, but with whom the retailer sustains no other relationship than having been such purchaser of its products.

Appellee Sam Person contends that, since, under the undisputed evidence, defendant union had no labor dispute with him nor any other connection, the picketing of his place of business was part of a plan on the part of defendant union to compel him by coercion to discontinue the sale of a brand of dairy products which his customers wished to buy, and to induce the public to refrain from purchasing such dairy products from him, such acts on the part of defendant union constituted an illegal trust and conspiracy in restraint of trade and a secondary boycott; that such actions are prohibited by both the civil and criminal statutes of this state, and are in direct contravention of both the state and federal constitutions protecting him in the ownership, use and enjoyment of his property and the right to engage in a lawful business in a lawful manner without interfer-

ence, and that, since the exercise of free speech is no more sacred nor entitled to more protection at the hands of the court than the right of an individual to own, use and enjoy his property, the courts of this state are fully authorized to enjoin such unlawful acts even though they be clothed in the guise of the exercise of the right of free speech.

R.S.Article 5152 provides that it shall be lawful for any and all persons engaged in any kind of work or labor to associate themselves together, and to form trade unions and other organizations for the purpose of protecting themselves in their respective pursuits.

R.S.Article 5153 provides that it shall be lawful for any member of such trade union or other organization to induce or attempt to induce, by peaceful and lawful means, any person to accept any particular employment, or to enter or refuse to enter, or relinquish any employment or pursuit in which such person may be engaged.

R.S.Article 5154 provides that the two preceding articles shall not apply to any combination or association formed for the purpose of limiting the production or consumption of labor's products, or for any other purpose in restraint of trade, and that nothing therein shall be construed to repeal, affect, or diminish the force and effect of, any statute on the subject of trusts, conspiracies against trade, pools, and monopolies.

R.S.Article 4642, Section 1, provides for injunctive relief, "where the applicant is entitled to the relief demanded and such relief or any part thereof requires the restraint of some act prejudicial to him."

R.S.Article 7426 defines a "trust" as:

"A combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or either two or more of them for either, any or all of the following purposes:

"1. To create, or which may tend to create, or carry out restrictions in trade or commerce or aids to commerce or in the preparation of any product for market or transportation, or to create or carry out restrictions in the free pursuit of any business authorized or permitted by laws of this State. * * *"

R.S.Article 7428 provides that:

"Either or any of the following acts shall constitute a conspiracy in restraint of trade. * * *

"2. Where any two or more persons, firms, corporations or association of persons, shall agree to boycott or threaten to refuse to buy from or sell to any person, firm, corporation or association of persons for buying from or selling to any other person, firm, corporation or association of persons."

Article 1632 of the Penal Code provides that any attempt to create or carry out restrictions in the free pursuit of any business authorized or permitted by the laws of this state shall constitute a trust.

Article 1634 of the Penal Code provides that where two or more persons, firms, corporations, or association of persons, shall agree to boycott or threaten to refuse to buy from or sell to any person, firm, corporation, or association of persons for buying from or selling to any other person, firm, corporation, or association of persons, shall constitute a conspiracy in restraint of trade.

Under Article 1635 of the Penal Code, the violation of the provisions of either of the two articles, last above referred to, is punishable by confinement in the penitentiary for a period of from two to ten years.

■ This court has heretofore held, and the rule seems to be established by an unbroken line of authorities, that picketing by labor organization or union or its members has been legalized by our statutes, with the limited objective of allowing striking employees, who have bona fide dispute with their employer over wages, hours, or working conditions, to persuade other employees to leave him, or to dissuade third persons from becoming his employees. It is, however, held:

"That our courts of equity will, in proper cases affecting labor organizations or unions, as well as any other litigants, grant protective injunctions where that relief is necessary to the continued preservation and enjoyment of an existing contract between parties having a legal right to make and live under it, as against third persons who sustain no relation either to such parties thereto or to the contract itself. * * *

"They have further declared that no right of free speech under the fundamental law of either nation or state is transcended by an injunction restraining the picketing of a place of business by persons (whether members of a labor organization or union, or not) who seek either to prevent the public from trading with the picketed place, or to compel its owner to break a contract which he has with some such disassociated third person." Carpenters & Joiners Union v. Ritter's Cafe, Tex.Civ.App., 138 S.W.2d 223, 226; same case, Tex.Civ.App., 149 S.W.2d 694, writ of error refused.

The only question, therefore, to be determined in this appeal is whether the rule followed in the Ritter case has been altered, or overruled, by decisions recently rendered by the Supreme Court of the United States, particularly in the cases of American Federation of Labor et al. v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. ——, and Milk Drivers Union of Chicago et al. v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. ——.

A careful analysis of the facts and of the opinions of the court in these cases convinces us that the decision in neither case has altered the rule established by the courts of this state, as applicable to this appeal.

■ In the case of American Federation of Labor v. Swing, supra, the plaintiffs were Ross W. Swing, the owner of a beauty parlor, and his employees. The Union attempted to secure a contract with the owner, and, while he was willing for his employees to join the union, he declined to compel them to do so. Thereupon the union picketed his place of business. The Supreme Court of Illinois granted an injunction restraining said picketing for the stated reason that there was no immediate dispute between Swing, the employer, and his employees. In its opinion reversing the action of the Illinois court, the Supreme Court, 372 Ill. 91, 22 N.E.2d 857, held that it would be improper to dispose of the case otherwise than on the face of the decree under review, which rested on the explicit avowal that peaceful persuasion was forbidden in that state, because those who were enjoined were not in Swing's employ. The Supreme Court of the United States, speaking through Justice Frankfurter, said [312 U.S. 321, 61 S.Ct. 570, 85 L.Ed. ——]: "We are asked to sustain a decree which for purposes of this case asserts as the common law of a state that there can be no 'peaceful picketing or peaceful persuasion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with him. Such a ban of free communication is inconsistent with the guaran-

tee of freedom of speech. * * * *The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ."* (Emphasis ours.)

As we interpret the opinion, the court in this case holds that, in the absence of criminal acts or other conduct prohibited by the statutes of a state, a union cannot be enjoined from picketing the place of business of an employer, with whom it is seeking to contract for its members, upon the sole ground that there is no labor dispute between the employer and his employees.

■ In the case of Milk Wagon Drivers Union v. Meadowmoor Dairies, Inc., supra, the Supreme Court of the United States affirmed a judgment by the Illinois Supreme Court, 371 Ill. 377, 21 N.E.2d 308, directing that a permanent injunction be issued restraining the picketing of the retail outlets of the Meadowmoor Dairies. The company sold its products to vendors, who in turn sold them to retail outlets. A labor dispute arose between it and the union, which resulted in the retail stores being picketed. Certain acts of violence took place during the controversy, although the pickets were not guilty of acts of violence. The company sought an injunction restraining the picketing of said retail stores. In sustaining the decision of the Illinois Supreme Court, the Supreme Court of the United States said [312 U.S. 287, 61 S.Ct. 554, 85 L.Ed. ——]:

"The question which thus emerges is whether a state can choose to authorize its courts to enjoin acts of picketing in themselves peaceful when they are enmeshed with contemporaneously violent conduct which is concededly outlawed. * * * Such a decree, arising out of a particular controversy and adjusted to it, raises totally different constitutional problems from those that would be presented by an abstract statute with an overhanging and undefined threat to free utterance. To assimilate the two is to deny to the states their historic freedom to deal with controversies through the concreteness of individual litigation rather than through the abstractions of a general law. * * *

"But utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution. * * * A state may withdraw the injunction from labor controversies but no less certainly the Fourteenth Amendment does not make unconstitutional the use of the injunction as a means of restricting violence. We find nothing in the Fourteenth Amendment that prevents a state if it so chooses from placing confidence in a chancellor's decree and compels it to rely exclusively on a policeman's club. * * * We merely hold that in the circumstances of the record before us the injunction authorized by the Supreme Court of Illinois does not transgress its constitutional power. * * * But just as a state through its legislature may deal with specific circumstances menacing the peace by an appropriately drawn act, Thornhill v. Alabama, supra [310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093], so the law of a state may be fitted to a concrete situation through the authority given by the state to its courts. This is precisely the kind of a situation which the Thornhill opinion excluded from its scope."

In effect, the court in this case held that, under the Federal Constitution, the right of free speech is not unlimited but that, under a proper state of facts, state courts are vested with authority to enjoin picketing by a labor organization in protecting the rights of its citizens where such picketing is "enmeshed" with violence, or where it involves such conduct as the state is authorized to declare unlawful, or the breach of such laws as are necessary for the protection and welfare of its residents.

This interpretation of the holding of the court in the Meadowmoor case is borne out by the holding of the Supreme Court of the United States in the case of Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 862, 81 L.Ed. 1229, wherein it is said that the term "peaceful picketing" "implies not only absence of violence, but absence of any unlawful act."

■ Further, Justice Frankfurter, in the opinion of the Supreme Court in the Meadowmoor case, quoted with approval from its opinion in the case of Carlson v. State of California, 310 U.S. 106, 60 S.Ct. 746, 749, 84 L.Ed. 1104, wherein it said: "The power and the duty of the State to take adequate steps to preserve the peace and protect the privacy, the lives, and the property of its residents cannot be doubted."

The anti-trust laws of this state, R.S. Article 7426 and 7428 and Articles 1632,

1634, and 1635 of the Penal Code, which prohibit any attempt to create restrictions in the full pursuit of any lawful business, or any agreement or threat to boycott a person or association by a refusal to buy from or sell to him or it, or to induce others to do so, are in full force and effect. Their constitutionality has recently been sustained by the Supreme Court of the United States in the case of Tigner v. State of Texas, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124, 130 A.L.R. 1321, and they have not been repealed or modified by the statutes which provide for the creation of labor organizations and for peaceful picketing (R.S.Articles 5152, 5153, 5154), in so far as they apply to the state of facts in the instant case.

The record shows that defendant union directed a picketing campaign against Sam Person, with whom it had no labor dispute, and with whom it neither wished to contract nor was eligible to contract for the benefit of its members. While there was no evidence of acts of violence on the part of the members of defendant union, the picketing of Person's place of business was admittedly instituted by defendant union in an attempt to force him, through injury to his business, to discontinue the sale of milk processed by the Borden Company, an act in direct violation of the anti-trust laws of the state.

The unchallenged findings of the court show that, unless enjoined, the picketing of Person's place of business would continue to cause him irreparable injury, and that he had no remedy at law, since defendant union had no property of any kind and was unable to respond in damages.

■ While, under the cited authorities, it is unquestionably the law that the right of free speech cannot be limited when exercised by a labor organization in a peaceful effort to secure employment for its members, the law is, we think, equally well settled that the courts of this state are vested with the authority, in protecting the rights of its citizens, to enjoin picketing by a labor organization where no labor dispute does or can exist between the labor organization and the person whose place of business is picketed, and where such picketing involves such illegal conduct on the part of defendant union as the state is authorized to and has declared unlawful, or where such picketing involves the violation of a law, the constitutionality of which has been sustained by the Supreme Court of the United States.

■ Under the above facts, the trial court properly granted a temporary injunction restraining defendant union from picketing Person's place of business.

Appellant the Borden Company's contention that the trial court abused its discretion in failing to grant a temporary injunction restraining the picketing and threats of picketing of its customers in Harris County, cannot be sustained.

The trial court, in his conclusions of law, held that the relief sought by the Borden Company should be denied because its customers, whose places of business it sought to enjoin defendant union from picketing, were not made parties to the suit, nor were they, with the exception of Sam Person, in whose favor an injunction was granted, specifically named in either the pleadings or the evidence, and that an injunction, if granted, in the terms sought, would be so vague and indefinite as to result in confusion for lack of proper description of the customers defendant union was enjoined from picketing.

■ The sole question presented in this phase of the appeal is whether the court abused its discretion in refusing the writ sought. The law is well settled that the granting or refusing of a temporary injunction is within the sound discretion of the trial court, and is not reviewable upon appeal unless it clearly appears from the record that there has been an abuse of such sound discretion. Harris County et al. v. Sam Bassett, Tex.Civ.App., 139 S.W. 2d 180; Frels v. Consolidated Theaters, Tex.Civ.App., 134 S.W.2d 369; Renfro v. Sperry, Tex.Civ.App., 134 S.W.2d 438, 439.

■ It is also well settled law in this state that a judgment granting an injunction should be so specific in describing the acts restrained as to leave nothing for further hearing and decision. Fort Worth Acid Works v. City of Fort Worth, Tex. Civ.App., 248 S.W. 822, affirmed Tex.Com. App., 259 S.W. 919.

■ The trial court in his conclusions of law held, in effect, that neither the pleadings nor the evidence were sufficient to support the issuance of the injunction sought by the Borden Company, in that an injunction in such broad terms, without naming the persons or firms in whose favor it was granted, would be confusing and misleading for lack of description of the par-

ties defendants were enjoined from picketing, to such an extent that the parties enjoined could not understand the extent of the injunction granted or the effect thereof, and would in all probability be deprived of the enjoyment of lawful rights in addition to those which were restrained.

Consideration of the record convinces us that the trial court did not abuse his judicial discretion in denying the temporary injunction sought in the instant case.

It follows from above conclusions that the judgment of the trial court must be in all things affirmed. It is so ordered.

Affirmed.

CODY, J., dissenting.

CODY, Justice (dissenting).

As stated by the majority, it has been the settled rule of decision in this State that picketing by the members of a trade union was illegal except as legalized by R.S. Articles 5152, 5153, and 5154, with the limited objective of allowing striking employes who have a bona fide labor dispute with their employer over wages, hours, or working conditions, to persuade other employes to leave him, or to dissuade third persons from becoming his employes. That, however, is equivalent to holding that the common law policy of Texas, in the absence of Articles 5152, 5153, and 5154, is to forbid peaceful picketing even where there is an immediate employer-employee dispute. The Supreme Court of the United States has held that due to the guarantee of free speech contained in the United States Constitution, no State can have such a common law policy. American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. ——. It has further held: "Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution." Senn v. Tile Layers, etc., 301 U.S. 468, 57 S.Ct. 857, 862, 81 L.Ed. 1229, 1236. And while the injunction was not sustained in Milk Drivers Union v. Meadowmoor Dairies, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. ——, the inference is that except for the unlawful manner in which the picketing was being conducted that it would have been enjoined even though there was no immediate employer-employee relationship between those picketing, and the places picketed. The fact that those picketing the sale of the Dairy Company products at Person's (i.e., the Ice Company's) place of business were not his employes is not decisive of their right to picket, and I dissent from the majority's holding to that effect, and to the effect that such picketing was illegal as being against the State's common. law policy.

The majority has also held that the picketing of the Ice Company's place of business is illegal because the same constitutes a violation of the anti-trust laws of this State. While it does not seem to me that the picketing in this case makes out a case in conflict with the anti-trust laws of this State, I cannot agree with and must dissent from the holding that the anti-trust laws of this State make the picketing by the union of the sale by the Ice Company of the products of the Dairy Company illegal. If, as I believe, the picketing which was enjoined constituted merely an exercise of freedom of speech guaranteed against interference with by the United States Constitution, then such picketing was not illegal, and the State was without power to pass valid legislation making such picketing illegal, so long as it qualified as an exercise of freedom of speech guaranteed under the United States Constitution.

From the briefs of the parties it seems to me there is some confusion in the minds of the parties as to just what the freedom of speech is that is guaranteed by the Constitution. It is elementary that the 1st Amendment to the Federal Constitution guarantees the freedom of speech against those vested with the governmental power of the Federal Government, while the 14th Amendment guarantees freedom of speech against any interference on the part of those vested with governmental power on the part of the State Government. This guarantee against interference on the part of the Government, State or Federal, has no effect upon the rights of the individuals inter sese. It adds nothing to the common law rights of the individual, and it takes nothing away from the common law rights of the individual, i.e., inter sese. The individual must answer to another individual for injury to reputation even though it be inflicted by the written or spoken word. And every actionable fraud is perpetrated by the use of words either written, spoken or implied, and the guarantee of freedom of speech is no defense. The State notwithstanding the freedom of speech guarantee still retains its full power to protect the common law rights of the individual

against injuries inflicted by the use of the written or spoken word. And the freedom of speech guaranteed by the Constitution affords no protection to use language to work an injury upon another, but is mere security against tyranny or oppression by the Government, State or Federal, and authorizes no oppression by one individual on another. It is true that an individual may, in seeking to serve his legitimate ends by the use of language, incidentally injure the business of another who has conflicting interest. But the injuries so resulting in such case are damnum absque injuria.

The fact that the picketing by the union of the sale of the Dairy Company's products by the Ice Company resulted in damages to the business of the Ice Company is not decisive. It was the common law right of the Ice Company to be free of malicious and wanton interference, disturbance, and annoyance in conducting said business. But should loss or disturbance come to such business "as a result of competition, or the exercise of like rights by others, it is damnum absque injuria, unless some superior right, by contract or otherwise, is interfered with. But if it come from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands upon a different footing." Delz v. Winfree, 80 Tex. 400, 404, 405, 16 S.W. 111, 112, 26 Am.St.Rep. 755. Therefore, if in picketing the sale of the Dairy Company's products at the Ice Company's place of business the members of the Union were serving an end and purpose of their own which was legitimate, they were not wantonly interfering with the rights of the Ice Company, and the State, acting through the courts, was without jurisdiction or power to interdict the use by the Union of language which not unfairly publicized the connection between the labor dispute and dairy products being sold by the Ice Company. Where an individual uses language which he has a common law right to use at the time and place he uses it because it serves a lawful purpose of his own, such common law right is the freedom of speech guaranteed against State interference by the 14th Amendment.

In this case the interests of the members of the Union, the former employees of the Dairy Company, came into conflict with those of the Dairy Company and a dispute arose. The Union undoubtedly had the right to publicize this dispute and to picket the plant of the Dairy Company to do so. It is a matter of common knowledge that milk is generally distributed either by delivery at the door of the consumer or by the consumer buying it at the grocery store. When the Dairy Company placed its products with the Ice Company, these products remained articles of commerce. And to the extent that the Ice Company dealt in the Dairy Company's products, the Ice Company was supporting interests which were conflicting with that of the Union. Furthermore, to the extent that the Ice Company dealt in the products of the Dairy Company, it was engaged in the same industry as was the Dairy Company. "The interdependence * * * of all engaged in the same industry has become a commonplace. [Authority] The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his own employ. Communication * * *. of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in Thornhill's case." The Swing case, supra [312 U.S. 321, 61 S.Ct. 570, 85 L.Ed. ——].

It follows from the quoted holding that, to the extent that the Ice Company made sales of the products of the Dairy Company, the Union had the right to picket such sales. While the holding in the Swing case is here controlling, the facts in the Swing case as to conflicting interests of the parties is not as closely in point as those of the Meadowmoor case, supra. In the Meadowmoor case milk was sold by the dairies to "vendors" operating their own trucks and who resold to retailers. The vendors departed from standards which the Union had achieved for its members as dairy employes. The Union, in order to compel observance of established standards, took action against dairies using the vendor system. The Meadowmoor Dairies brought suit against the Union to stop interference with the distribution of its products. The Supreme Court did not hold that the end sought by the Union was not a legitimate one; by implication it held that such end was a legitimate one, and that the means used to accomplish such end was lawful, but that the manner in which such means were used was illegal.

Had the Union undertaken to picket against the business of the Ice Company generally, this would have constituted a wanton interference with the Ice Company's business. The sales made by the Ice Company of articles other than the products of the Dairy Company with which the Union had a dispute, constituted no assistance to the Dairy Company in its dispute with the Union, and in making such sales the Ice Company would not be acting in competition with the discharged employees. In other words, the interference here caused by the picketing was limited to the accomplishment of a legitimate end, by lawful means in a lawful manner. Such picketing (of the Ice Company's sales of the Dairy Company's products) was no more a violation of the anti-trust laws of the State than was the picketing of the Dairy Company's plant. While the majority has held by inference that the picketing of the Dairy Company's plant would constitute a violation of the State anti-trust laws except for the authorization conferred by Articles 5152, 5153, and 5154, the Supreme Court has held, as pointed out above, that the Union would have a right to peacefully picket such plant without such authorization. If it be not against the anti-trust laws to picket the sale of the Dairy Company's products at its own plant (absent the articles 5152, 5153 and 5154), I fail to see how it can be against the anti-trust laws to picket the sale of the Dairy Company's products at the Ice Company's place of business. The guarantee of freedom of speech prevents the State from enacting laws, anti-trust or otherwise, which would take from an individual a right guaranteed him by the Constitution.

While we are bound by the decisions of the Supreme Court of the United States as to what the law is in applying the 14th Amendment, we are not bound by any exposition of Constitutional history to which it gives currency, which we may think erroneous. In the Meadowmoor case it imputes the paternity of the Bill of Rights to the Enlightenment, that is 18th Century French Philosophy. The spirit and aims of the Bill of Rights (i.e., security against tyranny) derive from the "fundamental laws of England." The English Bill of Rights wrote the declaration of the rights and liberties of Englishmen into the muniment of title by which the king holds his crown, long before we ceased being English subjects; from the English conception of "fundamental laws" securing the liberties of the individual was derived the American conception of fundamental law, of a Law that is superior to the will of those in whom is vested power of government, i.e., Constitutional Law.

"But the 'Whig Oligarchy' (i.e., the 'great Whig Families'), was submissive to the rule of law, and the English laws gave to the Executive no power to suppress speech or writing that attacked the Government. Unless the Law Court found a critic of Government guilty of Sedition, Ministers could do nothing to silence him. The Law Court not the Government, decided what was libel, blasphemy or sedition. And the Judges were independent of the Executive, and the Juries were often hostile.

"This highly civilized conception of law as a power superior to the will of the rulers was strong among the Eighteenth Century English. The Law of England had triumphed in the great battle with the Stuart Kings; the idea of the rule of law —as propounded by Coke and Seldon—had been victorious on the field of Naseby; had been muddled away by the quarrels and outraged by the violence of its Puritan Champions; had been restored in 1660, imperilled in the later years of Charles II, destroyed by James II, but had finally triumphed at the Revolution. The King had then been made definitely subject to the law. The prerogative that claimed to be above the law had been killed dead. The Whig Oligarchy, after 1714, made use of the powers of the Crown as defined by the Revolution of 1688. But those powers so defined were closely limited. The irremovable Judges could no more be removed by the Whig nobles than by the King." England Under Queen Anne, "The Peace and the Protestant Succession", pages 320 and 321, by G. M. Trevelyan.

It follows from these conclusions that it is my opinion the temporary injunction so granted by the trial court against the Union should be in all things vacated, set aside and annulled, and therefore I must respectfully dissent from the opinion of the majority. The informal expression of my dissent, as indicated at the time it was made, will be withdrawn.