Charles A. Loreto, J.
Plaintiff moves for an injunction pendente lite, in conjunction with its suit for plenary relief, to restrain and enjoin the defendants from engaging in acts interrupting, interfering with and harmful to its proper functioning.
The defendants countermove to dismiss the complaint as insufficient in law, claiming that the picketing here in question *174 involves and grows out of a labor dispute and therefore there is a failure on the part of the plaintiff in its complaint to make the necessary allegations required by section 876-a of the Civil Practice Act.
Plaintiff is a domestic membership corporation engaged in operating on a nonprofit, voluntary, charitable basis, a home and hospital for the care, treatment and maintenance of 196 aged, sick and infirm patients chronically sick and indigent, who require constant care and attention. To carry on its work it employs 152 unlicensed and nonprofessional employees.
The present difficulty had its origin when two rival unions, the defendant Local 1199, Drug & Hospital Employees Union, AFLhCIO, and Local 144, Hotel & Allied Service Employees Union, B. S. E. I. U., AFLhCIO, some time prior to September, 1962, began to engage in organizational activities of plaintiff’s employees. Both unions in this rivalry for recognition and control indulged in the distribution of leaflets, mass demonstrations, organizational meetings on the hospital premises, which necessarily interfered with its proper functioning in caring for its patients. Although not required by law, and believing that it would bring an end to these disturbing activities on the part of both unions, plaintiff’s management voluntarily agreed to permit an election to be held among its employees to determine which one of the two unions they favored, hoping thereby to have quiet and order restored in the hospital.-
Accordingly arrangements were made on the invitation of the plaintiff to hold a secret ballot election on its premises on September 26,1962 to be supervised by a certified public accountant with two observers of each of the interested parties. There were 152 unlicensed and nonprofessional employees eligible to vote. Of this number 134 appeared and voted. The result of the voting was 68 votes for Local 144 and 66 votes for defendant, Local 1199. The defendants contest the right to vote of eight employees who it asserts were professional employees. They claim that eliminating those votes, the defendant union would have been victor of the election. The plaintiff points out that those eight employees were working supervisory employees and submits their affidavits to show the nature of ordinary work they performed. It also states that when they voted they were not challenged by defendants’ watchers and that only those employees who performed exclusively supervisory duties did not vote.
Immediately following the election, it is charged that a large number of employees led by representatives of the defendant union conducted a sit-down strike in plaintiff’s home and hos *175 pital, using space and facilities intended for the conduct of its business, congregated and paraded through the public halls, shouting they would not work and would not leave the building, shouting and dancing, sitting on the floor with their feet on the walls, interfering with the normal operation of the home and hospital, thereby jeopardizing the health and welfare of the aged, infirm and sick patients. It is also charged that the defendant union established a mass picket line in front of plaintiff’s entrances, day and night, increasing in numbers at visiting hours to as many as 40 in number, thereby having the effect of intimidating and discouraging visitors to and patients in the hospital. Other illegal acts are charged which will later be mentioned.
At the outset, plaintiff declares that no labor dispute is here involved. The court agrees.
Public policy indubitably declares that the plaintiff, a charitable institution — not engaged in an industry, craft or occupation within the purview of paragraph (b) of subdivision 10 of section 876-a of the Civil Practice Act — is specifically exempt from the obligation of collective bargaining (New York State Labor Eelations Act; Labor Law, art. 20, § 715). This is a matter now of public concern and interest.
The right to strike and to take any action which is intended to harrass, interfere with and harm the proper functioning of a voluntary, nonprofit hospital, will he considered inimical not only to the patients but also to the public generally, whatever the motive for such conduct may be. In view of relatively recent conflicts of a similar nature decided by our courts, it is difficult to believe that the defendants didn’t know that this is the law. (Society of New York Hospital v. Hanson, 185 Misc. 937, affd. 272 App. Div. 998; Jewish Hospital of Brooklyn v. “ John Doe ”, 252 App. Div. 581; Beth-El Hosp. v. Robbins, 186 Misc. 506; Brooklyn Hebrew Hosp. v. Ottley, 25 Misc 2d 502, affd. 13 A D 2d 786; Mount Sinai Hosp. v. Davis, 17 Misc 2d 727.)
Perhaps recognizing this statutory and decisional impasse, defendants’ attorneys argue that the plaintiff has waived the immunity granted to it by the statute. In effect, their argument is that the plaintiff is under a contractual obligation with the defendant union; that having offered it an invitation to enter into the election, it is contractually bound to enter into collective bargaining with the defendant union claiming to be the victor of the election.
This indeed is an ingenious and novel contention. No citation or precedent to sustain it, has been presented. What is the source from which this contention springs ? It is nothing more than plaintiff’s invitation or proposal to hold an election in the *176 hope of avoiding the continued interference with its orderly functioning, caused by the organizing activities of the two rival unions. Even if this were considered to be an offer, the response to it by defendant union was ‘ ‘ under protest ’ ’. There was no unequivocal acceptance of the terms of the proposed election. The matter had not even reached the stage of an agreement to agree, which, of course, would be unenforcible. For the parties not having agreed to all the terms of any contract, no one else would have the authority to specify its terms on their behalf.
And upon what does the defendant union premise its claim to an election victory and a contractual right to collective bargaining with plaintiff? It lies in its disputed assertion that the votes of working supervisory employees should not have been counted. There is nothing in the written communications of the parties which would operate to exclude working supervisory employees from the voting. Defendant Leon J. Davis states in his affidavit that “the defendant understood that supervisory employees would not participate in such election for the reason that they represent and speak for management ’ ’. But nowhere does he indicate the basis of such an understanding or any agreement to that effect.
The plaintiff shows that those employees in addition to supervisory duties, regularly performed tasks in the hospital identical to those performed by other workers, whose voting was not challenged. It was within the competence of the supervisor of the election to treat them as bona fide employees, whose votes were properly cast and counted. In any event, there is no showing of a contractual right to a hearing to overrule the election supervisor’s acceptance of the protested votes. Nor is any such right found in the statute.
There is no merit to the argument that plaintiff incurred a contractual obligation with the defendant union to hold an election upon its terms and to enter into a collective bargaining agreement with plaintiff. The written communications between the parties (and no oral commitment is claimed) merely opened the way for initial contact, which never reached the stage of contract.
It is the court’s opinion that it was the legislative intent that an institution of this character should not lose its statutory exemption by any act or acts short of its actual entry into a collective bargaining agreement. If this were to be subject to a determination of equivocal and disputed factual situations that are to be interpreted as a waiver, then the peace and freedom from a disturbance, such as here took place, intended to be given to the institution, could easily be rendered meaningless. In other *177 words, it is the court’s belief that even after an election by its employees as to which union they preferred, the plaintiff could not be required to enter into collective bargaining with any union; that no legal principal of waiver or estoppel is operative in a situation of this kind; that only when such an institution has actually executed a collective bargaining agreement, would its statutory exemption be surrendered.
Another point that the defendant union raises is that 54 employees were wrongfully discharged by the plaintiff and that what exists is a lockout. But the facts relating to their discharge, which clearly emerge from the affidavits, show that at least 25 of the employees in question, together with others, abandoned their work, entered the office of the superintendent of the hospital, virtually took possession of it and refused to return to their jobs, notwithstanding the repeated and ardent pleas that they return to work and not neglect the aged, chronically ill and helpless patients. The management was ultimately required to call the police who removed these employees by arresting them. The management then had a right to discharge them from their employment. This was not a case of a lockout. It was an outright sit-down strike.
One more aspect of this dispute must be considered on this motion. It is the matter of the picketing conducted by defendant union. Plaintiff’s affidavits show that mass picketing was carried on in front of the entrance to the hospital both during the day and at night and that the number of pickets increased to as many as 40 during visiting hours. Certainly such extensive picketing conducted in a manner which would obstruct the entrance and exit of visitors and tend to cause confusion and disorder and create anxiety and distress to the patients and their visiting relatives, is more than may be considered legitimate. The defendant union states that its picketing was conducted in an orderly and peaceful manner, for the purpose of publicizing its grievance, to protest the discharge of the employees and to secure their reinstatement. The issue raised as to the extent and nature of this picketing cannot and need not be resolved on affidavits.
The right to peaceful picketing is claimed as the constitutional right to free speech. The defendant union asserts its right to inform the public of its claims. This right of free speech will not be denied nor curtailed. However, necessarily and impliedly, the exercise of this right may not be unbridled and unlicensed. That the picketing in this case went clearly beyond the bounds of what might be considered proper to inform the public of any grievance, is indicated by the undenied proof that the defendants *178 resorted to mass picketing, the pickets parading in front of the private residence of a highly respected jurist, carrying libelous and abusive placards, bearing heavy and large print with the following wording: .
“JUDGE THOU SHALT NOT STEAL
THE ELECTION OF 54 WORKERS.”
(Name omitted by the court).
This jurist was chairman of the board of directors of the plaintiff hospital. The only grievance as to him that the opposing affidavits disclose is the failure of defendant union in having succeeded after the election to make an appointment to speak with him.
There is not a word of denial that the defendant union engaged in this picketing. Nor any explanation given why such a grossly offensive charge as printed on the placards can be considered as reporting the truth or are accurately aimed at informing the public. There is not a scintilla of justification shown for this conduct. Truly it is shocking, reprehensible and outrageous, deserving the unhesitating and scathing rebuke of the court. Conducted at a considerable distance from the hospital, in an exclusively residential area, it was apparently aimed to cause unspeakable embarrassment, humiliation and mortification to the named jurist and his family. It represents a form of direct and unmitigated coercion and terrorism that should be roundly denounced and sternly condemned. Not within any conceivable limit of the right to free speech and the right to inform, it represents a mean, foul and sinister blow, one to which decent unionism would not stoop.
This court ardently favors fair and just wages and conditions of employment for the workingman, whoever he may be. But when aggrieved, such terms and conditions must be sought under the law. No longer are the parties to a labor dispute justified in resorting to jungle tactics and indiscriminate warfare in their struggle for success. More need not be said on this aspect of the case. What took place here in this respect is glaring proof of the improper and extreme limits to which the defendant union went in its picketing.
In conclusion it is noted that after the election the plaintiff hospital entered into an agreement with the rival union, Local 144, which it is reported provides for wage rates, benefits and employment terms and conditions for its employees, considered the most advantageous to any employees of any comparable voluntary nonprofit hospital in New York City.
*179 The plaintiff has demonstrated its right to a temporary injunction. Therefore, the stay contained in the order to show cause will be continued. The defendants ’ cross motion to dismiss the complaint is denied.