Jerome M. Keefe, Plaintiff-Appellee, v. Organization for a Better Austin, Justin M. McCarthy, William Holmes, and Kathy Metropoulos, Defendants-Appellants.

Gen. No. 53,057.

First District, First Division.

September 29, 1969.

Rehearing denied and opinion modified October 30, 1969.

David C. Long and William A. Pomerantz, of Chicago, for appellants.

■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■

Thomas W. McNamara, Raymond, Mayer, Jenner & Block, of Chicago, for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

Defendants appeal from an interlocutory order which found that their activities in Westchester, Illinois, a suburb of Chicago where plaintiff, a real estate broker, resided, "invaded plaintiff's right of privacy." The order temporarily restrained defendants from passing out literature and from picketing "anywhere in the City of Westchester," but denied injunctive relief as to plaintiff's place of business in the Austin neighborhood of Chicago. Defendants' direct appeal to the Illinois Supreme Court was transferred to this court on the ground that it had no jurisdiction on direct appeal in this case.

On appeal, the determinative issue is whether the temporary injunction enjoining the picketing and distribution of leaflets in the area of the plaintiff's home denied defendants' freedom of speech and press under the First and Fourteenth Amendments to the United States Constitution and Article II, section 4 of the Illinois Constitution.

Plaintiff is a real estate broker operating in the Austin area of the City of Chicago. From time to time he solicits listings from property owners by door-to-door distribution of his business card. The card contains the name "Jerry's Real Estate" and gives his business address and telephone number. It bears the legend, "We invite your listings. We have prospective buyers for income property and residential property in the Austin area."

The Austin area is undergoing racial change, and the defendant Organization for a Better Austin (OBA), an integrated community organization, has been working to

237

keep white residents in the community. In its efforts to stabilize the community and to deal rationally with integration, the OBA is attempting to stop "panic peddling" by those brokers who exploit residents of racially changing areas by fomenting panic among them. Among its committees is the Real Estate Practices Committee, which deals with "panic peddlers." The OBA objects to any form of solicitation of real estate listings, and it has obtained written agreements from a number of local real estate brokers covering selling practices, which agreement plaintiff refused to sign.

In order to induce plaintiff to stop these solicitations of real estate listings, defendant OBA initiated a program of picketing and leaflet distribution in the areas of his home and his place of business. The purpose of these activities admittedly was to make plaintiff agree to stop soliciting business. The Westchester leaflets gave plaintiff's home address and telephone number and urged Westchester residents to call plaintiff and tell him to sign the agreement. The leaflet contained the statement: "When he signs the Agreement we stop coming to Westchester."

At the trial, defendant William A. Holmes, when cross-examined about the primary motive for passing out "pluggers" in Westchester, said:

> A. "All right, I'll answer that by saying that my primary motive was to ask Mr. Keefe to make a public act of faith in the community where he is making his living, and because he failed to do this—in fact he said that we don't want a thing to do with you, and we don't care about your community—so we went out and decided to let his, let his neighbors know what he was doing to us."

Q. "And, by doing this, you had hoped that he would finally sign this agreement that you submitted, is that right?"
A. "Yes, Sir."
Q. "All right."

On October 4, 1967, plaintiff commenced the instant action for injunctive relief. In plaintiff's amended complaint it is alleged that the defendants were displeased with the manner in which plaintiff conducted his real estate business and accused him of being "a blockbuster (selling real estate to one Negro family and then frightening the other property owners in the neighborhood whereby they became panicky and began to offer their property for sale through plaintiff's real estate office), which course of conduct on the part of defendants commenced on or about August 15, 1967, and continued through October 1, 1967, and still continues without any justifiable cause, reason or excuse."

Plaintiff alleged that members of the OBA picketed his place of business and distributed literature through the community "criticizing him and impugning his reputation as an honest and law-abiding operator of a real estate business," and attacked the business tactics employed by the plaintiff. The relief prayed for was an injunction restraining defendants from picketing his place of business and his home and from distributing derogatory pamphlets.

Defendants answered and admitted picketing and the distribution of circulars, and stated "that the activities that they engaged in were an exercise of the rights of freedom of speech and assembly guaranteed to them by the Constitution of the United States and of the State of Illinois." Defendants denied that plaintiff was entitled to any injunctive relief against them.

239

After a hearing, in which both sides introduced the testimony of witnesses and exhibits, the trial court entered an order on December 20, 1967, which included the following findings:

4. That on September 9, 16, and 30, 1967, and October 22, 1967, some members of the Organization went to Westchester, Illinois, a suburb of Chicago, where the plaintiff resides, and distributed leaflets consisting of mimeographed sheets containing critical descriptions of the manner in which plaintiff was conducting his real estate business in the Austin neighborhood;

5. That said leaflets were distributed in several locations at various times on the said dates: to residents of some homes in the neighborhood of plaintiff's place of residence, to some people in a shopping center in Westchester, and to some parishioners on their way to or from Mass at the Divine Infant Church in Westchester;

6. That the said distribution of leaflets was on all occasions conducted in a peaceful and orderly manner, did not cause any disruption of pedestrian or vehicular traffic, and did not precipitate any fights, disturbances or other breaches of the peace;

7. That the defendants have a right to engage in a peaceful picketing of the plaintiff's place of business;

8. That defendants have no right to distribute the said leaflets in Westchester, the suburb in which plaintiff resides;

9. That defendants' activities in Westchester have invaded plaintiff's right of privacy, causing irreparable harm, and that plaintiff has no adequate remedy at law.

The order granted plaintiff injunctive relief as to his home and denied it as to his place of business. This is the order from which defendants appeal.

As to the distribution of leaflets, defendants assert that a number of cases cited by the United States and Illinois Supreme Courts have clearly established that the distribution of noncommercial pamphlets, leaflets and literature is fully protected under the State and Federal constitutional free speech and press clauses against prior restraint. On this point defendants' authorities include: Lovell v. Griffin, 303 US 444 (1938), and Schneider v. Town of Irvington, 308 US 147 (1939).

In Lovell v. Griffin, supra, a State ordinance prohibited the distribution of literature of any kind within the limits of the City of Griffin without the permission of a city official. The Supreme Court found this provision to be an unconstitutional restraint on freedom of speech and the press and stated (p 452):

> "The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion. . . .

> "The ordinance cannot be saved because it relates to distribution and not to publication. 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' Ex parte Jackson, 96 US 727, 733."

In Schneider v. Town of Irvington, supra, State ordinances prohibited the distribution of literature without a

license from the chief of police. There the Supreme Court held the licensing made impossible the free and unhampered distribution of pamphlets and said (p 164):

> "As said in Lovell v. City of Griffin, supra, pamphlets have proved most effective instruments in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people. On this method of communication the ordinance imposes censorship, abuse of which engendered the struggle in England which eventuated in the establishment of the doctrine of the freedom of the press embodied in our Constitution. To require a censorship through license which makes impossible the free and unhampered distribution of pamphlets strikes at the very heart of the constitutional guarantees."

Defendants also cite the following cases where the Supreme Court of Illinois held that ordinances which licensed the distribution of pamphlets and circulars violated section 4 of Article II of the Constitution of Illinois: Village of South Holland v. Stein, 373 Ill 472, 26 NE2d 868 (1940), and City of Blue Island v. Kozul, 379 Ill 511, 41 NE2d 515 (1942).

In Village of South Holland v. Stein, supra, a village ordinance made it unlawful for anyone to go to a private residence for the purpose of soliciting without a license. There the court cited Lovell v. City of Griffin and Schneider v. Town of Irvington, and said (p 479):

> "The constitution of Illinois is even more far-reaching than that of the constitution of the United States in providing that every person may speak freely, write and publish on all subjects, being responsible for the abuse of that liberty. Webster's International Dictionary defines the word 'publish' as meaning 'to bring before the public as for sale or distribution.'"

242

In City of Blue Island v. Kozul, supra, an ordinance provided that all "peddlers" have a license. Defendant, a member of Jehovah's Witnesses, walked up and down the streets with a 15-year-old boy, carrying a sign and offering to sell a publication for five cents. In reversing the conviction the court held the ordinance unconstitutional. There the court said (p 514):

> "Section 4 of article 2 of the constitution of Illinois provides: 'Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that liberty.' The first amendment to the constitution of the United States provides: 'Congress shall make no law . . . abridging the freedom of speech, or of the press.' It has been frequently held that the freedom of speech and of the press secured by the first amendment against abridgement by the United States is similarly secured to all persons by the fourteenth amendment against abridgement by a State."

And at page 515:

> "Recent pronouncements of the Supreme Court of the United States make it obvious that the ordinance here in question, as applied to the sale and distribution of the magazines and leaflets by the defendant is unconstitutional and a violation of the right of freedom of speech and of the press. Lovell v. City of Griffin, supra; Schneider v. Town of Irvington, supra."

Defendants further argue that injunctions restraining the distribution of literature are as much prohibited as the ordinances found unconstitutional by the Illinois and United States Supreme Courts. (Near v. Minnesota, 283 US 697 (1931); Montgomery Ward & Co. v. United Employees, 400 Ill 38, 79 NE2d 46 (1948).) Defendants fur-

ther cite Martin v. Struthers, 319 US 141 (1943), where the United States Supreme Court held that Jehovah's Witnesses had a constitutional right to distribute their information from door to door. The right to distribute was recognized even though the Witnesses rang doorbells at a time of the day when many residents were accustomed to be sleeping. Despite this disturbance, the right to distribute information was upheld. Defendants note that in the instant case no such disturbance was created and the leaflets were merely placed in or near the doors of the homes and no doorbells were rung and none of the residents complained. In Martin v. Struthers, supra, the court said (p 145):

> "While door-to-door distributors of literature may be either a nuisance or a blind for criminal activities, they may also be useful members of society engaged in the dissemination of ideas in accordance with the best tradition of free discussion. The widespread use of this method of communication by many groups espousing various causes attests its major importance."

And at page 146:

> "Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved. The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas."

Defendants further argue, "This Court and the United States Supreme Court, in the above decisions, have held unconstitutional restraints on the free and unfettered distribution of circulars, pamphlets and other forms of expression; those restraints have ranged from licensing provisions to across the board prohibitions on such distribution by way of injunction. All were struck down by the courts. In the instant case defendants are faced with an injunction prohibiting their distribution of any literature, anywhere in a village of over 18,000 people. Such a restraint clearly violates both the United States and Illinois constitutions."

Plaintiff contends that the right to free speech is not unqualified, and that defamatory attacks upon plaintiff personally, with the purpose of having plaintiff abandon his lawful business practices and forcing him to sign the "No solicitation" agreement, are properly the subject of prior restraint. Cases cited include Austin Congress Corp. v. Mannina, 46 Ill App2d 192, 196 NE2d 33 (1964), where this court affirmed an injunction that had been issued against defendants restraining them from picketing plaintiff's nursing home and publicly stating, among other things, that plaintiff was in violation of the Building Code. Defendants contended that there was an absolute right to picket, provided that such picketing was peaceful, truthful and informational, and the court said (p 203) :

"That picketing for the purpose of harassment and to cause economic ruination even under the cloak of publicizing the truth of a purported building code violation is violative of the public policy of the State of Illinois is well settled. In Carpenters' Union v. Citizens' Committee to Enforce Landis Award, 333 Ill 225, 246, 164 NE 393, our Supreme Court stated:

" 'No persons, individually or by combination, have the right to directly or indirectly interfere with or disturb another in his lawful business or occupation or for the sake of compelling him to do some act which in his own judgment his own interest does not require. Losses wilfully caused by another from motives of malice to one who seeks to exercise and enjoy the fruits and advantages of his own enterprise, industry, skill or credit will sustain an action.'

"And at 247:

" 'Coercion is as easily accomplished without threats of violence as with them, and fear of loss of or injury to business unless one submits to demands is as effective as fear of violence to his person. No person has a right to make war on another and to compel others to break off business relations with him to his injury. If an evil motive does not make a lawful act unlawful, it is equally true that what may be regarded as a good motive will not make an unlawful act lawful.' "

Plaintiff further cites Carpenters' Union v. Citizens Commission, 333 Ill 225, 164 NE 393 (1928), where the Carpenters' Union sought an injunction against the Citizens Committee to Enforce the Landis Award, a not-for-profit corporation, and certain individuals to restrain the defendants from, inter alia, interfering with plaintiff's business and "from attempting to interfere with or disturb or prevent employment of complainants by newspaper advertisements, telephone messages, letters, circulars, notices, personal conversations, economic pressure or any other means." There the court said (p 238):

"No person or combination of persons has the right, directly or indirectly, to interfere with or disturb

246

another in his lawful business or occupation or for the sake of compelling him to do some act which in his own judgment he does not approve. Losses caused by willful interference, without legal cause or justification, with the relations of employer and employee or with their freedom to contract are maliciously caused and will sustain an action at law, or, in a proper case, an injunction may be obtained to restrain the wrongful interference."

On the basic issue of picketing and distribution of literature, and after examining the injunctive order, its findings and relief granted, we think it is obvious that the trial court accepted the guidelines and principles set forth in defendants' authorities by its denial of injunctive relief as to plaintiff's place of business, but subordinate to plaintiff's "right of privacy" in the area of his residence and church. Therefore, no discussion is required here as to the basic issue of defendants' right to picket and to distribute literature, as set forth herein.

On the issue as to plaintiff's "right of privacy" in Westchester in the area of his residence, defendants argue that they have in no way criticized or even discussed plaintiff's private life or private conduct. The only references made by the defendants about the plaintiff concern his sales techniques and gave defendants' opinion as to the effect of such sales techniques on defendants' community. Defendants argue that the sales techniques and practices of real estate brokers, including those of the plaintiff, are the subject of great public interest and concern, particularly the problem created by real estate sales techniques which may be characterized as "panic peddling." Defendants assert that "groups such as the Organization for a Better Austin, which are attempting to create a stably integrated community are thwarted by the fear and panic created as a result of real estate brokers' active solicitation by phone call, business card and personal visit to homes in blocks adjoining segregated

247

areas. A stable integrated community is one where people of all races reside in all parts of the community and not one where the periphery of the Negro ghetto is integrated only between the time the first Negro moves in and last white moves out. There are few domestic social issues more pressing than the one with which the defendants are attempting to deal," and that "real estate sales techniques should be a matter of personal privacy would be a surprising result in the light of the growing public concern and interest in the effect of real estate practices on one of America's most pressing social problems—race relations."

Defendants' authorities on this point include Time, Inc. v. Hill, 385 US 374 (1967). In that case a magazine was alleged to have falsely reported that a new play portrayed an experience suffered by plaintiff and his family when held hostage in plaintiff's home. Plaintiff sued for damages under the New York right of privacy statute. There the Supreme Court held the article involved to be constitutionally protected, and the court said (p 388):

"The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine and comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. Exposure of the self to others in varying degrees is a concomitant of life in a civilized community. The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press. 'Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' "

Defendants further argue that "the significance of Time v. Hill is magnified by the fact that it articulated constitutional protections for speech and press in the context of subsequent punishment or subsequent compensation for alleged speech and press excesses, while here the constitutional issues are posed in the context of prior restraint—an injunction. The constitutional protections against prior restraint on speech and the press have traditionally been and are to this day greater than those applicable to 'subsequent punishment' for the exercise of speech and press freedoms. It is clear that defendants' constitutionally protected right to distribute leaflets cannot be enjoined on the basis of what is here a nonexistent right of privacy."

Plaintiff argues that the importance of privacy has been recognized and supported by the United States Supreme Court. Authorities include Breard v. Alexandria, 341 US 622 (1951), where the Supreme Court sustained an ordinance prohibiting door-to-door salesmen and said (pp 625–6):

> "All declare for liberty and proceed to disagree among themselves as to its true meaning. There is equal unanimity that opportunists, for private gain, cannot be permitted to arm themselves with an acceptable principle, such as . . . a free press, and proceed to use it as an iron standard to smooth their path by crushing the living rights of others to privacy and repose."

Plaintiff further contends that injunctive relief is the proper remedy where privacy has been wrongfully invaded. Authorities cited include Pipe Mach. Co. v. De More, 76 NE2d 725 (1947), (appeal dismissed 149 Ohio St 582, 79 NE2d 910 (1948)), and Hebrew Home & Hospital for Chronic Sick, Inc. v. Davis, 38 Misc2d 173, 235 NYS2d 318 (1962). In Pipe Mach. Co., supra, striking

249

employees went to the residences of eight working employees of plaintiff, carrying placards naming each employee, describing him as a "scab" and bearing legends such as "How can you stand to live so near him?" The court held that the purpose of the picketing in the vicinity of the employees' residences was not to give the public information as to the merits of the strike but to intimidate or persuade them to join the strikers. The court held that an injunction restraining the defendants from picketing and circulating placards at or near the employees' residences did not infringe the rights of free speech, stating (p 727):

> "We are not dealing here with a limitation upon the right of free speech. It is obvious that picketing in this case was not for the purpose of disseminating any information as to the strike. Picketing interfered with the quiet and peaceful environment of the homes and thereby established conditions making more difficult the raising of a family and the maintenance of a home."

Also, in Hebrew Home & Hospital for Chronic Sick, Inc. v. Davis, supra, the court said (p 324):

> "There is not a scintilla of justification shown for this conduct. Truly it is shocking, reprehensible and outrageous, deserving the unhesitating and scathing rebuke of the court. Conducted at a considerable distance from the hospital, in an exclusively residential area, it was apparently aimed to cause unspeakable embarrassment, humiliation and mortification to the named jurist and his family. It represents a form of direct and unmitigated coercion and terrorism that should be roundly denounced and sternly condemned. Not within any conceivable limit of the right to free speech and the right to inform, it represents a mean, foul and sinister blow, one to which decent unionism would not stoop."

250

Plaintiff further cites an article on residential picketing written by Professor Alfred Kamin, of the Loyola University School of Law, in which it is said (pp 201–202, Northwestern University Law Review, Vol 61):

> "In every reported American case, residential picketing has been either declared illegal under criminal statutes and municipal regulations, banned by injunction, or proscribed by administrative cease and desist orders."

Plaintiff asserts that "defendants' activities in Westchester share the same vice condemned in the residential picketing cases. The OBA activities in Westchester are coercive, not informative. They disrupt family life and interfere with the right of privacy. They are not entitled to protection under the guise of free speech."

Finally, defendants contend that the injunction here is overly broad and that the trial court erred in enjoining defendants from picketing anywhere in the Village of Westchester. Defendants assert that the trial court issued an injunction against picketing by defendants anywhere in the Village of Westchester, "absent any allegation or evidence by the plaintiff or finding by the court that defendants had engaged in *any* picketing in the village of Westchester." Defendants further state that if there had been any evidence of defendants' picketing in Westchester, the injunction entered here, prohibiting picketing anywhere in this village of over 18,000 people, would be the kind of "blanket prohibition" on picketing which was condemned as violating the First Amendment. Cited is Centennial Laundry Co. v. West Side Organization, 34 Ill2d 257, 215 NE2d 443 (1966), where it is said (p 266):

> "These blanket prohibitions are unrelated to the purpose for which the picketing, distribution of literature or demonstrating might be conducted, and they

251

are so sweeping and imprecise as to offend constitutional guarantees of freedom of speech, press and assembly."

■ We conclude that the trial court was correct in finding: "9. That defendants' activities in Westchester have invaded plaintiff's right of privacy, causing irreparable harm, and the plaintiff has no adequate remedy at law," and in granting injunctive relief in Westchester, the area of plaintiff's home. The purpose of the defendants was not to inform the public of a matter of public interest, but the sole purpose was to force plaintiff to sign a "No solicitation" agreement. There was no evidence to show that plaintiff was engaged in "panic peddling" in Westchester or that he intended to do business in Westchester. Coercion, not speech, was the purpose and object of defendants' activities. As said in Pipe Mach. Co. v. DeMore, supra (p 727):

> "The allowable area of economic conflict should not be extended to an invasion of the privacy of the home. . . .

> "The common law has always treated the home of a person with great respect. The home is referred to as a man's 'castle' or as his 'sanctuary.' Picketing homes and the use of language referring to the head of the house as a 'scab' would not aid in establishing the proper environment for a home."

As said in Hebrew Home & Hospital for Chronic Sick, Inc. v. Davis, supra, the situation here "represents a form of direct and unmitigated coercion and terrorism" that should not be permitted.

■ We find no merit here in defendants' charge that the injunction was overly broad. The area of defendants' activities in Westchester, a city of 18,000, was broad,

and no prejudice to defendants is apparent or demonstrated by the inclusion of the entire Village as the restraint area. We believe the public policy of this state strongly favors protection of the privacy of home and family from encroachments of the nature of defendants' activities, and defendants' right of "free speech" is not involved here.

Therefore, for the reasons given, the order of the Circuit Court of Cook County is affirmed.

Affirmed.

ADESKO, P. J. and BURMAN, J., concur.