**AMALGAMATED MEAT CUTTERS et al.,**
**Appellants,**

v.

**CARL'S MEAT & PROVISION COMPANY,**
**Appellee.**

**No. 7317.**

Court of Civil Appeals of Texas,
Beaumont.

Dec. 9, 1971.

Rehearing Denied Jan. 6, 1972.

Mullimax, Wells, Mauzy & Collins, Dallas, for appellants.

Passman, Jones, Stewart, Andrews & Company, Dallas, for appellee.

KEITH, Justice.

We review an order granting a temporary injunction issued after a lengthy hearing. Defendants were restrained and enjoined, pending a trial upon the merits of the cause from

" . . . distributing, publishing and disseminating to the public or to anyone statements pertaining to or making or uttering, in writing or otherwise, derogatory remarks concerning Plaintiff's meat products to the effect that such meat products or the Plaintiff's premises and/or the equipment contained therein is unsatisfactory or unsanitary, and further statements to the effect or as would tend to indicate that Plaintiff is producing meat products for sale to the public as might be injurious to the public or in any way unfit for human consumption or making or uttering statements that concern the capabilities of the employees of Plaintiff; . . . "

Plaintiff is engaged in the business of processing meat and poultry for distribution and sale to various restaurants, institutions, and commercial users in the Dallas area while, according to plaintiff's allegations, "The defendant claims to represent various employees of Plaintiff which are engaged in striking and picketing Plaintiff's place of business in connection with a labor dispute."

Plaintiff alleged that on August 2, 1971, defendant mailed to various customers of plaintiff a letter and "Quality Warning" stating in part that the Texas State Department of Health had issued reports documenting unfavorable sanitary conditions within plaintiff's plants and had condemned as unfit for human consumption large quantities of meat processed therein. Four days later, so plaintiff alleged, defendant began distributing handbills near a cafeteria which bought meat from plaintiff, the handbill (which was specifically made a part of the temporary injunction order) being appended hereto as an exhibit.

Plaintiff alleged that the information so disseminated was false. This was followed by very general allegations that such conduct "will cause irreparable damage and injury to Plaintiff's business and in fact, Plaintiff has reason to believe that such actions by Defendant to date have already damaged and generally interfered with Plaintiff's business all to the damage and detriment of the Plaintiff." Plaintiff then alleged that it would "suffer irreparable harm, damage, detriment and injury" for which it had no adequate remedy at law unless the temporary injunction should issue. The prayer was for a permanent injunction upon a final hearing but no other relief was sought—and particularly, plaintiff did not seek damages, either actual or punitive.

The trial court found that the statements so made "were, according to the testimony, either incorrect or misleading or taken from context; and that the Defendant[s] . . . were utilizing such information as a plan and scheme under which to bring about an end result to which Plaintiff had no adequate remedy at law."

A review of the record indicates that the statements contained in the handbill were at least partially true, but we do not take issue with the trial court's findings that some of such statements were "misleading or taken from context." But, we do note that the trial court did not find, as plaintiff now contends, that such statements were false. For the purpose of this opinion, we will assume that the statements were, in fact, false, at least in part.[1]

But it is also true, as stated by defendant in its brief:

"There was no evidence of coercion or threats; no primary or secondary picketing of anyone; no effort to induce sec-

ondary activity of any sort; and no actual damage shown to Appellee."

It seems apparent, however, that the activities of defendants are not conducive to increased sales of meat to be consumed by customers who were "handbilled."

It appears without dispute in our record that the controversy between the parties arises out of a labor dispute. Defendants so contend in their brief, and plaintiff responds by stating that "[i]t is, however, fair to state that 'handbilling' the public commenced as a result of a labor dispute . . . in that APPELLANT has not been recognized as the bargaining representative of APPELLEE'S employees." We find other references in the record showing the pendency of charges and countercharges with the National Labor Relations Board arising out of the dispute. Indeed, after submission of this cause, plaintiff filed with this court an instrument showing clearly that National Labor Relations Board had assumed jurisdiction of the dispute and had entered an order. Defendant has not replied to such "evidence" nor has it objected to our consideration thereof.

However, defendant has no point attacking the trial court's jurisdiction to hear the cause under the preemption doctrine so forcefully applied to the Texas courts in Ex parte George, 371 U.S. 72, 83 S.Ct. 178, 9 L.Ed.2d 133 (1962), vacating and reversing the decision of the Supreme Court of Texas reported in 163 Tex. 103, 358 S.W. 2d 590 (1962). As was said in *George*: "The District Court was without jurisdiction if petitioner's picketing was arguably prohibited or arguably protected by the National Labor Relations Act." (371 U.S. at p. 73, 83 S.Ct. at p. 179.) See also Brotherhood of R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 89 S.Ct. 1109, 22

1. "It is elementary, of course, that in a case of this kind the courts do not concern themselves with the truth or validity of the publication. Under Near v. Minnesota, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), the injunction, so far as it imposes prior restraint on speech and publication, constitutes an impermissible restraint on First Amendment rights." Chief Justice Burger in Organization for A Better Austin v. Keefe, 402 U.S. 415, 29 L.Ed.2d 1, 91 S.Ct. 1575 (1971).

L.Ed.2d 344 (1969); Amalgamated Association of Street, Electric Railway and Motor Coach Employees v. Lockridge, 403 U.S. 274, 29 L.Ed.2d 473, 91 S.Ct. 1909 (1971). For an excellent discussion of the development of the doctrine, see Jeffers, "The Labor Injunction in Texas Courts Today," 36 Texas Law Rev. 938 (1958).

While we have doubt as to the jurisdiction of the district court under the preemption doctrine, it not having been raised by the defendant, we do not do so, sua sponte.[2]

Plaintiff places primary reliance upon Cain, Brogden & Cain, Inc. v. Local Union No. 47, Etc., 155 Tex. 304, 285 S.W.2d 942, 946 (1956), wherein the court said: "It is now well settled that peaceful picketing loses its protection under the constitutional guaranty of free speech if *one* of its purposes is contrary to public policy." [emphasis in original] It then calls to our attention this language from Ex parte Tucker, 110 Tex. 335, 220 S.W. 75, 76 (1920):

"Equity will protect the exercise of natural and contractual rights from interference by attempts at intimidation or coercion. Verbal or written threats may assume that character. When they do, they amount to conduct, or threatened conduct, and for that reason may properly be restrained. Cases of that sort, or of analogous nature, are not to be confounded with this one."

We disagree with the contention so advanced. Any prior restraint on expression comes to this court with a "heavy presumption" against its constitutional va-

lidity. *Keefe,* supra (402 U.S. 415, 91 S. Ct. 1575, 29 L.Ed.2d at p. 5). The constitutional principle governing our action is that set out by the court in Ex parte *Tucker,* supra:

"The existence of *any* power in a court of equity to supervise one person's opinion of another, or to dictate what one person may say of another, is plainly and emphatically refuted by the 8th section of the Bill of Rights [of the Texas Constitution].

"That section, in part, reads:

"Every person shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or the press."

In Dallas General Drivers, Etc. v. Wamix, Inc., of Dallas, 156 Tex. 408, 295 S. W.2d 873, 879 (1956), the present Chief Justice, speaking for the majority said:

"In Ex parte Tucker, 110 Tex. 335, 220 S.W. 75, this Court committed itself emphatically to the proposition that the right of one to speak ill of another is protected by the Bill of Rights, Sec. 8, of Article I of the State Constitution, and that a court has no power to control by injunction what one person says of another, even in a labor dispute, unless there be evidence that language will be used which is intimidating and coercive in character."

See also, Lawrence v. Atwood, 295 S.W. 2d 298, 300 (Tex.Civ.App., Beaumont, 1956,

---

2. See the following authorities supporting the potential authority of an appellate court to note its lack of jurisdiction even though no assignment is directed at such fact: Perkins v. United States Fidelity & Guaranty Co., 299 S.W. 213, 219 (Tex. Com.App.1927); Morrow v. Corbin, 122 Tex. 553, 62 S.W.2d 641, 649 (1933); St. Louis Southwestern Ry. Co. of Texas v. Hall, 98 Tex. 480, 85 S.W. 786, 787 (1905); Hunt v. Johnson, 106 Tex. 509, 171 S.W. 1125, 1126 (1914); Wagner v.

Warnasch, 156 Tex. 334, 295 S.W.2d 890, 893 (1956); State v. Sunland Supply Co., 404 S.W.2d 316, 319 (Tex.Sup.1966). Indeed, it appears to be the duty of the appellate court to note its lack of jurisdiction when the same appears of record, notwithstanding the provisions of Rule 374. McCauley v. Consolidated Underwriters, 157 Tex. 475, 304 S.W.2d 265, 266 (1957); Affolter v. Affolter, 389 S.W.2d 742, 744 (Tex.Civ.App., Corpus Christi, 1965, no writ).

no writ); McMorries v. Hudson Sales Corp., 233 S.W.2d 938, 941 (Tex.Civ.App., El Paso, 1950, no writ); Annotation 47 A.L.R.2d 715; 43 C.J.S. Injunctions § 135, p. 680.

Should we concede that plaintiffs are correct in stating "that the intended purpose [of handbilling] was to coerce and/or restrain the direct customers of Appellee from buying Appellee's product by placing fear [of eating contaminated meat] in the minds of the buying public," we do not reach the result sought. Again, the answer is to be found in *Keefe,* supra, from which this quotation is taken:

"The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper. See Schneider v. State, supra [308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939)]; Thornhill v. Alabama, 310 U.S. 88, 60 S. Ct. 736, 84 L.Ed. 1093 (1940). Petitioners were engaged openly and vigorously in making the public aware of respondent's real estate practices. Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others. But so long as the means are peaceful, the communication need not meet standards of acceptability." [402 U.S. at p. 419, 29 L. Ed.2d at p. 5, 91 S.Ct. at p. 1578.]

There is at least one case in Texas which seems to adopt a different rule, Gibraltar Savings & Building Ass'n v. Isbell, 101 S. W.2d 1029, 1033 (Tex.Civ.App., Galveston, 1937, no writ). There, while recognizing the general rule that "Equity does not intervene to restrain the publication of words on a mere showing of their falsity," the court then mentioned that there is an exception, this being the holding:

"It [equity] intervenes in those cases where restraint becomes essential to the preservation of business or other property interests threatened with impairment by illegal combinations or by other tortious acts, the publication of the words being merely an instrument and incident." [authorities omitted.]

See also case notes in 16 Texas Law Rev. 111 (1938) and 17 Texas Law Rev. 97 (1939). But, Sheppard does not indicate that the case has ever been followed in this state.

The general rule that courts of equity will not enjoin the publication of a libel has been subjected to considerable criticism. See, e. g., Pound, "Equitable Relief Against Defamation and Injuries to Personality," 29 Harvard Law Rev. 640 (1916); case note 27 Texas Law Rev. 723 (1949). The rule announced in *Tucker,* supra, seems to be more compatible with the more recent expressions of the Supreme Court of the United States than does the broad language previously quoted from the *Cain Case. Keefe,* supra, is an excellent example when the state court opinion is examined. See, Keefe v. Organization For a Better Austin, 115 Ill.App.2d 236, 253 N.E. 2d 76 (Ill.App.1969).

Texas has an elaborate system of criminal statutes regulating punishment for publication of libelous material, Title 16, Ch. 1, Art. 1269, Vernon's Ann.Penal Code. There are statutes relating to the civil actions for libel to be found in Title 88, Art. 5430 et seq., Vernon's Ann.Civ.Statutes. It is to be noted that Art. 1291, Vernon's Ann.Penal Code, makes the jury the judge of the fact and the law as well as of the intent with which a libel may have been published.

It is likewise to be noted that there is no *specific* statute authorizing injunctive relief to enjoin a publication of a libel to be found in our statutes. Under the emphatic language used in *Tucker,* supra (220 S.W. at p. 76), no such implied power can be found from the general language used by the legislature in Art. 4642, Vernon's

Ann.Civ.Statutes, the only possible source of statutory authorization.

In this case, plaintiff did not even allege that it had been damaged by the handbilling and sought no damages; it made no showing that it had invoked the criminal sanctions of the Penal Code. The only relief it sought was to enjoin further publication of the libelous statements. It was "[a] pure suit for injunction [and] is classed as an action for equitable relief." Rogers v. Daniel Oil & Royalty Co., 130 Tex. 386, 110 S.W.2d 891, 894 (1937). It was not an ancilliary injunction which was sought by plaintiff. Southwestern Telegraph & Telephone Co. v. Smithdeal, 104 Tex. 258, 136 S.W. 1049 (1911).

■ It follows from what has been said that we are of the opinion that the trial court did not possess jurisdiction to grant the equitable relief sought by the plaintiff since the only relief sought was violative of defendant's right of freedom of speech.

The temporary injunction heretofore granted is dissolved and the cause is dismissed, without prejudice, however, to plaintiff's rights, if any, to pursue their remedy in damages. Perkins v. United States Fidelity & Guaranty Co., supra (299 S.W. at 219); Pearson v. State, 159 Tex. 66, 315 S.W.2d 935, 938 (1958).

## APPENDIX

### TO THE PUBLIC!

THIS RESTAURANT (CAFETERIA) HAS IN THE PAST PURCHASED MEAT AND MEAT PRODUCTS FROM CARL'S MEAT AND PROVISION CO., DALLAS, TEXAS. CARL'S MEAT AND PROVISION CO. HAS, AS RECENTLY AS THE LAST THREE MONTHS, BEEN FOUND BY THE TEXAS STATE HEALTH DEPARTMENT TO BE PRODUCING MEAT PRODUCTS UNDER UNSATISFACTORY, UNSANITARY CONDITIONS. FOR EXAMPLE, WALLS AND CEILING IN THE MEAT PROCESSING AREA WERE FOUND DIRTY AND CHIPPING. RAILS IN THE SAME AREA WERE FOUND TO BE IMPROPERLY BLOODY AND DIRTY. MEAT PROCESSING MACHINES WERE DIRTY. AND THAT IS NOT ALL. OVER A TEN-MONTH PERIOD, MEAT PRODUCTS RANGING FROM BEEF TENDERLOIN TO WILD RICE DRESSING TO FLOOR SWEEPINGS WERE CONDEMNED AS UNFIT FOR HUMAN CONSUMPTION OR OTHERWISE UNLAWFUL.

Now, the employees of Carl's Meat and Provision Company in Dallas have been forced on strike by the company. As a result, products now sold by Carl's Meats and Provision Company are not being processed by the well trained, experienced employees who have done so in the past, but by stop-gap scab employees who do not have the same level of experience as the regular employee.

FOR YOUR PERSONAL BENEFIT, WE URGE THAT, IF YOU ENTER THIS RESTAURANT (CAFETERIA) TO EAT, YOU REQUEST THAT YOU BE SERVED MEAT OR MEAT PRODUCTS FROM SOME SUPPLIER OTHER THAN CARL'S MEAT & PROVISION COMPANY.

We do not request that you not enter or patronize this restaurant (cafeteria)

/s/ Bobby B. Nelson

STEPHENSON, Justice (dissenting).

I respectfully dissent. The majority opinion is based upon the premise that this temporary injunction violates defendants' right of free speech and free communications guaranteed by the *First Amendment to the Constitution of the United States* and *Section 8 of Article I of the Constitution of the State of Texas*. The majority rely on Ex parte Tucker, 110 Tex. 335, 220 S.W. 75 (1920), in support of their position in which the Supreme Court first indicates that a person is free to say anything he

wants to about another person and the remedy is not the denial of the right to speak, but appropriate penalties for what is wrongfully spoken. However, the last paragraph of the *Tucker* opinion makes it clear that injunctive relief is available under certain circumstances, such paragraph reading as follows:

"Equity will protect the exercise of natural and contractual rights from interference by attempts at intimidation or *coercion. Verbal* or written threats may assume that character. When they do, they amount to conduct, or threatened conduct, and for that reason *may properly be restrained.* Cases of that sort, or of analogous nature, are not to be confounded with this one." (220 S.W. at p. 76) [emphasis supplied]

The *Tucker* opinion is some fifty years old at the time of writing this opinion, but it has been consistently followed by the Supreme Court of this state to this date. A well written opinion in Cain, Brogden & Cain, Inc. v. Local Union No. 47, Etc., 155 Tex. 304, 285 S.W.2d 942 (1956), reviews both the federal and state cases on this point and relates the proposition, in the face of the same contention made in the present case, as follows:

"It is now well settled that peaceful picketing loses its protection under the constitutional guaranty of free speech if *one* of its purposes is contrary to public policy." (285 S.W.2d at p. 946) [emphasis by the court]

The law stated in *Tucker* is reaffirmed by the Supreme Court in Dallas General Drivers, Etc. v. Wamix, Inc., of Dallas, 156 Tex. 408, 295 S.W.2d 873, 879 (1956), as follows:

"In Ex parte Tucker, 110 Tex. 335, 220 S.W. 75, this Court committed itself emphatically to the proposition that the right of one to speak ill of another is protected by the Bill of Rights, Sec. 8 of Article I of the State Constitution, and that a court has no power to control by injunction what one person says of

another, even in a labor dispute, unless there be evidence that language will be used which is *intimidating and coercive in character."* [emphasis supplied]

I have concluded that defendants' actions were both unlawful and contrary to public policy and therefore lost their protection under the constitutional guaranty of free speech. Article 5154f, V.A.C.S., provides among other things that it is unlawful for a labor union to engage in secondary picketing or a secondary boycott. Those terms are defined in Article 5154f, Sec. 2 d and e as follows:

"d. The term 'secondary picketing' shall mean the act of establishing a picket or pickets at or near the premises of any employer where no labor dispute, as that term is defined in this Act, exists between such employer and his employees.

"e. The term 'secondary boycott' shall include any combination, plan, agreement or compact entered into or any concerted action by two or more persons to cause injury or damages to any person, firm or corporation for whom they are not employees, by

"(1) Withholding patronage, labor or other beneficial business intercourse from such person, firm or corporation; or

"(2) Picketing such person, firm or corporation; or

"(3) Refusing to handle, install, use or work on the equipment or supplies of such person, firm or corporation; or

"(4) Instigating or fomenting a strike against such person, firm or corporation; or

"(5) Interfering with or attempting to prevent the free flow of commerce; or

"(6) By any other means causing or attempting to cause an employer with whom they have a labor dispute to inflict any damage or injury to an employer who is not a party to such labor dispute."

In the *Cain Case,* supra, the court discussed Carpenters and Joiners Union, Etc. v. Ritter's Cafe, 149 S.W.2d 694 (Tex. Civ.App., Galveston, 1941, error ref.), in which the union picketed Ritter's Cafe even though their labor dispute involved a construction job with Ritter some distance away, resulting in the affirmation of a judgment granting a permanent injunction. Also, in the *Cain Case,* supra, the court discussed Borden Co. v. Local No. 133, Etc., 152 S.W.2d 828 (Tex.Civ.App., Galveston, 1941, error ref.), in which the defendant union had a labor dispute with Borden Company and picketed the place of business of a retailer who sold Borden's milk. The Supreme Court of Texas refused a writ of error in the *Borden Case.* Then the Supreme Court made this pronouncement in the *Cain Case,* to-wit:

"It may be said that the foregoing decisions rest primarily on the ground that the labor practices enjoined were in violation of the public policy of this state, as expressed in the statutes, to suppress trusts and conspiracies in restraint of trade. It may also be said, however, that they rest, in part at least, on the ground that the practices enjoined were violative of the public policy of this state against secondary boycotts and picketing of an employer with whom no dispute existed in order to force him to join with the union in applying coercive pressure on an independent employer with whom a dispute did exist, or, alternatively, to breach a contract or break off business relations with such employer." (285 S.W.2d at p. 948–949)

The Supreme Court of Texas in the *Wamix Case,* supra, after quoting Judge Learned Hand as follows:

"Judge Learned Hand has defined a secondary boycott in these words: 'The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the

hope that this will induce the employer to give in to his employees' demands.' International Brotherhood [of Electrical Workers], etc. v. N.L.R.B., 2 Cir., 181 F.2d 34, 37." (295 S.W.2d at p. 882)

then came to these conclusions:

"From the foregoing discussion we conclude that while secondary picketing as defined in Cain, Brogden & Cain v. Local Union No. 47, etc., supra, is contrary to the public policy of this state and subject to judicial restraint, not all picketing which has a secondary effect will be regarded as proscribed by the public policy; that two important factors in determining whether picketing in a particular case because of its secondary effect on neutral employers is proscribed by the public policy are: (a) the good faith intent of the union or striking employees in picketing a secondary situs to exert pressure only on the primary employer, to which effort the effect on neutral employers is purely incidental, and (b) the balancing of relative rights of all affected parties against the harm which would result to the other parties and to the public from permitting or restraining the picketing. In a hearing on a temporary injunction these matters will ordinarily address themselves to the sound discretion of the trial judge and only rarely may the issue be decided as a law question. If the Court concludes, upon evidence of probative force, that the real purpose of picketing at a secondary situs is to exert economic pressure on a neutral and it has that effect there will be no need to consider the second factor." (285 S.W.2d at p. 884)

Applying the rules laid down in the *Wamix Case* to the factual situation before us, we must consider the good faith intent of the union in handbilling the cafeteria and restaurant customers in exerting pressure upon the owners of such cafeterias and restaurants to influence the plaintiff in its dealings with the union, and we must balance the relative rights of all of the parties affected. I have concluded defend-

ants' actions in this case are contrary to public policy.

It should also be considered that this is an appeal from an order granting a temporary injunction to preserve the status quo pending a final hearing on a permanent injunction. Under such circumstances, it is clear that the trial court's judgment will be reversed only where the issuance of the writ was a clear abuse of discretion. Texas Foundries v. International Moulders & F. Wkrs., 151 Tex. 239, 248 S.W.2d 460 (1952). Transport Co. of Texas v. Robertson Transports, 152 Tex. 551, 261 S.W.2d 549 (1953). In my opinion, the trial court did not abuse its discretion in granting the temporary injunction.

STEPHENSON, J., dissented to denial of rehearing.