CAIN, BROGDEN & CAIN, INCORPORATED V. LOCAL UNION
No. 47, INTERNATIONAL BROTHERHOOD OF TEAMSTERS
CHAUFFEURS, WAREHOUSEMEN AND HELPERS, ET AL

No. A-5008. Decided January 4, 1956.
Rehearing overruled February 8, 1956.
(285 S.W. 2d Series 942)

*Tilley, Hyder & Law* and *Thos. H. Law,* all of Fort Worth, for petitioner.

The Court of Civil Appeals erred in upholding the picketing when its object was to induce the contractor to cease doing business with the subcontractor who employed nonunion men and who did not pay union wages, and also in holding that the picketing was authorized as an economic context of the dispute, when as a fact petitioner contractor was not in the industry represented by the union, but merely used materials which were transported by a subcontractor's nonunion truck drivers. International Union of Operating Engineers v. Cox, 148 Texas 42, 219 S.W. 2d 787; International Brotherhood v. Missouri Pacific Transport Co. 22 S.W. 2d 219, Refused N.R.E.; Best Motor Lines v. International Brotherhood, 150 Texas 95, 237 S.W. 2d 589.

*Mullinax & Wells* and *Otto B. Mullinax,* all of Dallas, for respondent.

MR. JUSTICE SMITH delivered the opinion of the Court.

This is a suit to enjoin respondent Union and certain of its members from picketing the construction project of petitioner Cain, Brogden & Cain. A temporary injunction was issued by a district court of Tarrant County. The injunction has been dissolved by the Court of Civil Appeals. 272 S.W. 2d 243.

Respondent is Local 47 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers. Petitioner is Cain, Brogden & Cain Construction Company, a general contractor for two construction projects in Fort Worth, the Fair West Shopping Center and Matthews Memorial Methodist Church. Respondent, for some months before the events at issue here, had been trying to effect contracts with all of the general contractors in the Fort Worth area to insure that wages and working conditions commensurate with those required by union members would be maintained among all workers, union or nonunion, hired either directly or through subcontractors, for hauling jobs in connection with the construction industry in Tarrant County. The record shows that some seven weeks or two months before the picketing, which resulted in this injunction, a representative of respondent had a conversation with petitioner's foreman, Sager, for the purpose of securing work for union truck drivers on petitioner's Fair West job. Sager's reply to this inquiry is squarely disputed by the parties but in any event the uncontroverted testimony is that petitioner Cain was never contacted by respondent until the day before the picket was placed on the Fair West project. Petitioner employed some of the workmen on the project directly, including both union and nonunion members, but subcontracted certain portions of the work to subcontractors, including Childress, who had a subcontract for supplying sand and gravel to the construction site. The date of execution of this subcontract does not appear, nor is it clear whether it was before or after respondent's first conversation with Sager regarding the hauling jobs.

On August 2, 1954, Blankenship, a representative of respondent, telephoned petitioner Cain and, as related by Cain, the following conversation transpired:

"The telephone rang and the man said he was Mr. Blanken-

ship, business agent for the teamsters and truck drivers; he says, 'You have got a man working out on Matthews Memorial Church that's using—Joe Campbell,' he said, 'using nonunion truck drivers.' I said, 'Well, Mr. Campbell is a subcontractor.' He says, 'If it isn't stopped, we are going to put pickets on your job.' I says, 'You will have to talk to Mr. Campbell, because he has the subcontract and I have no control over him.' "

\* \* \*

"During this construction [sic] he said that Jim Childress was hauling gravel at Fair West and if I didn't stop that, he would put pickets on that job."

"What did you say to that?"

"I told him Mr. Childress had a subcontract and I had no control over him."

\* \* \*

"He (Blankenship) wanted to come out and talk about Mr. Childress and I told him to go talk to Mr. Childress — that I had no control over him."

Respondents' witnesses denied that Blankenship mentioned Childress in the telephone conversation or made any statement to Cain "about taking anybody off of" the Fair West job, asserting that Blankenship only requested Cain to negotiate with respect to the payment of union wages and observance of union hours and working conditions on the Fair West project and on future construction projects.

On the following morning a picket was posted on the Fair West job. One picket was used. He carried a sign to the effect that respondent was on strike against petitioner "for better wages and working conditions." As a result of this picketing. most of the union members on the project stopped working and petitioner was substantially injured.

The trial court found that no labor dispute existed between petitioner and its employees and that there was no complaint from such employees as to wages, hours or working conditions; that none of petitioner's employees was a member of respondent Union and none was eligible for membership therein; that no labor dispute existed between petitioner and respondents; that

the picketing had prevented and, unless enjoined, would continue to prevent the delivery of supplies, material and equipment to petitioner's premises to its irreparable damage; and, finally, that the action by respondent in picketing petitioner's premises constituted secondary picketing and a secondary boycott.

The trial court accordingly enjoined respondent from "(a) picketing at or near any of the premises where plaintiff [petitioner] is engaged in construction work in Tarrant County, Texas; (b) interfering with or attempting to prevent the free flow of commerce to and from any of plaintiff's [petitioner's] premises in Tarrant County, Texas."

The Court of Civil Appeals dissolved the injunction on the ground that it infringed upon the freedom of speech guaranteed respondents by the First and Fourteenth Amendments to the United States Constitution. In the light of that holding it is not inappropriate to examine some of the decisions which shed light on the question.

In Thornhill v. State of Alabama, 310 U.S. 88, 60 Sup. Ct. 736, 84 L. Ed. 1093, the United States Supreme Court declared that the advertisement of a labor dispute by picketing was protected from statutory restriction by either Congress or any legislature because of the free speech guarantees of the First and Fourteenth Amendments. See also Carlson v. People of State of California, 310 U.S. 106, 60 Sup. Ct. 746, 84 L. Ed. 1104. Since that decision, in a long series of cases, the court has announced a great many qualifications upon this original doctrine. Indeed, even in the Thornhill case, it was broadly intimated that a state would be justified in regulation of picketing, based upon "either the number of persons engaged in the proscribed activity, the peaceful character of their demeanor, the nature of their dispute with an employer, or the restrained character and accurateness of the terminology used in notifying the public of the facts of the dispute."

In the cases which followed Thornhill, certain areas of permissible regulation were indicated. Picketing could be enjoined if it formed a part of a labor controversy characterized by threats and violence. Milk Wagon Drivers' Union of Chicago v. Meadowmoor Dairies, Inc., 312 U.S. 287, 61 Sup. Ct. 552, 85 L. Ed. 836. It could be enjoined if the objective of the picketing was to force a violation of a "Right to Work" law, similar to Art. 5207a, Vernon's Annotated Texas Civil Statutes, Building Service Em-

ployees v. Gazzam, 339 U.S. 532, 70 Sup. Ct. 784, 94 L. Ed. 1045. Restriction was proper where the picketing union sought to force the employment of negro workers in proportion to the negro customers of the employer. Hughes v. Superior Court of California, 339 U.S. 460, 70 Sup. Ct. 718, 94 L. Ed. 985. In the case of Carpenters and Joiners Union v. Ritter's Cafe, 315 U.S. 722, 62 Sup. Ct. 807, 809, 86 L. Ed. 1143, an injunction was held proper where the union, in protest against labor practices on a construction project, picketed a cafe owned by the owner of the project, which cafe was a mile and a half from the construction site. The basis for the Ritter decision was that the cafe was outside "the economic context" of the labor dispute and therefore the picketing of the cafe was not privileged.

In the case of Giboney v. Empire Storage and Ice Co., 336 U.S. 490, 69 Sup. Ct. 684, 688, 93 L. Ed. 834, the United States Supreme Court upheld an injunction against picketing which had as its objective the elimination of nonunion ice peddlers in Kansas City, Missouri, in violation of the anti-trust laws of the state, and especially Mo. Rev. Stats. Ann. 8301. In that case, the union was picketing the ice company to force it to stop selling to nonunion ice peddlers. The court concluded that the picketing was merely a part of an illegal scheme by the union to monopolize the retail distribution of ice in Kansas City and that, as such, it was subject to regulation by statutes based on a state policy against monopoly or "restraint of trade."

In International Brotherhood v. Hanke, 339 U.S. 470, 70 Sup. Ct. 773, 94 L. Ed. 995, decided in 1950, an injunction against picketing was sustained where the union was seeking to force self-employed used-car dealers to observe the same business hours as did dealers employing union members. The Supreme Court of Washington, in which state the Hanke case originated, had declared that the policy of the State of Washington favoring the protection of independent self-employed businessmen was sufficiently important to override the interest of the union in maintaining a high standard of wages and working conditions among car dealers. In upholding the injunction, the United States Supreme Court emphasized this language of the state court and held that the court could not deny to a state the power to implement such an important and socially desirable policy.

■ It thus appears from the above decisions that the protection accorded picketing as "free speech" in the Thornhill decision has been substantially qualified by successive rulings

of the United States Supreme Court. What we must decide is whether the picketing here involved is entitled to that protection or whether it must yield to the public policy of this state. In deciding the question all conflicts in the evidence must be resolved in support of the trial court's judgment.

■ It is now well settled that peaceful picketing loses its protection under the constitutional guaranty of free speech if *one* of its purposes is contrary to public policy. National L.R.B. v. Denver Bldg. & Construction Trades Council, 341 U.S. 675, 95 L. Ed. 1284, 71 Sup. Ct. 943. Moreover, it matters not whether the public policy violated be declared by the legislature, as it was in the Gazzam and Giboney cases, or by the courts, as it was in the Ritter's Cafe, the Hughes and the Hanke cases. In Hughes v. Superior Court of California, supra, the court said: "The fact that California's policy is expressed by the judicial organ of the State rather than by the Legislature we have repeatedly ruled to be immaterial."

■ The testimony of Cain, quoted above, would perhaps support a conclusion that one purpose of the picketing was to compel the discharge of all nonunion employees on the Fair West project and the employment of only union members thereon, a purpose contrary to the public policy of this state as declared by Article 5207a, Vernon's Annotated Texas Civil Statutes. Picketing for that purpose could be enjoined. Building Service Employees v. Gazzam, supra; Construction and General Labor Union, Local No. 688 v. Stephenson, 148 Texas 434, 225 S.W. 2d 958. Relief was not sought on that ground, however, and we will take no further note of it.

Respondents assert that the injunction was sought and granted only on the ground that the picketing violated Article 5154f, Vernon's Annotated Texas Civil Statutes, and that it cannot be sustained on that basis because Article 5154f was held unconstitutional by this court in the Stephenson case, supra. We do not view the plaintiff's petition and the trial court's findings so narrowly. The allegations and the prayer in the petition are broad enough to support an injunction against secondary picketing and a secondary boycott, and the trial court's judgment contains a general finding that the picketing constituted secondary picketing and a secondary boycott. It remains only to be determined whether the evidence supports the court's finding, and, if so, whether such labor practices are contrary to the public policy of this state.

The record in this case shows that petitioner and Childress were independent enterprisers, doing business with each other on a contract basis. The contract was in existence and in performance at the time the picketing began. There is no evidence that it was entered into in bad faith to escape the obligations of an employer-employee relationship. Petitioner had simply contracted to buy and Childress had contracted to sell a certain quantity of sand and gravel and the service of delivering it to petitioner's construction site. Nothing in the record indicates any power in petitioner to regulate Childress' employment practices. There is no showing that petitioner participated in any way in the hiring, firing or supervision of any of Childress' employees. The uncontroverted testimony of Cain was that he had nothing to say about the wages, hours or working conditions maintained by Childress. Childress was the offending employer. It was he who employed nonunion men, paid nonunion wages and failed to observe union hours and working conditions.

There was no complaint by respondent union that petitioner paid its own employees less than the union wage scale or that their hours and working conditions did not conform to union standards. Its declared basis of complaint, through Blankenship, related solely to the labor practices of Childress. Instead of carrying on negotiations with Childress respondents picketed petitioner. The sign carried by the pickets bore this writing: "On strike against Cain, Brogden & Cain for better wages and working conditions. Teamster's Local 47, A.F. of L." By their sign respondents announced to the public and to members of other unions that it was petitioner who refused to pay union wages and observe union working conditions. One purpose of the picketing may have been, as respondents contend, to compel petitioner to negotiate with respect to wages, hours and working-condition provisions to be incorporated in future subcontracts, but there is evidence to support the conclusion that one purpose was to coerce petitioner, on pain of injury to his business, to force Childress to cease the offensive labor practices, or, alternatively, to withdraw from the contract. In our judgment, such a course of action is the classic example of a secondary boycott. It was a combination by respondents to exercise coercive pressure upon petitioner, as a customer of Childress, to withdraw patronage from Childress, even to the extent of breaching a valid contract, through fear of loss or damage to itself if it did not do so. Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 Sup. Ct. 172, 176, 65 L. Ed. 349, 16 A.L.R.

196; Bayonne Textile Corp. v. American Federation of Silk Workers, 116 N.J. Eq. 146, 172 Atl. 551, 557, 92 A.L.R. 1450; 15 C.J.S. 1013, Conspiracy § 12; 31 Am. Jur. 957, Labor, § 252.

Other than Article 5154f, supra, there is no legislative enactment in this state which defines and prohibits secondary boycotts and secondary picketing. In International Union of Operating Engineers v. Cox, 148 Texas 42, 219 S.W. 2d 787, we held that in so far as that article undertook to define a labor dispute as a dispute between an employer and a majority of his employees and to prohibit picketing except where such a dispute existed it ran afoul of the constitutional guaranty of free speech. Similarly in the Stephenson case, supra, following the decisions of the Supreme Court of the United States in American Federation of Labor v. Swing, 312 U.S. 321, 61 Sup. Ct. 568, 85 L. Ed. 855, and Cafeteria Employees Union v. Angelos, 320 U.S. 293, 64 Sup. Ct. 126, 88 L. Ed. 58, we held the article unconstitutional in so far as it confined the right of a union to picket to those situations where there was a labor dispute between the employer and his employees, the record in that case showing that the picketing union had a bona fide economic interest in the subject matter of its controversy with the employer. In no case has this court held a secondary boycott as defined in and known to the common law, including the coercive force of picketing, to be harmonious with the general public welfare, protected by the constitutional right of free speech, or immune from restraining judicial process.

Cases involving industrial strife between employer and employee require a careful weighing of the rights of each to the end that the power of the judiciary, when invoked, will be used to prevent an imbalance deleterious to the public welfare. Carpenters & Joiners Union v. Ritter's Cafe, 315 U.S. 722, 724, 62 Sup. Ct. 807, 86 L. Ed. 1143, 1146. In Hudson County Water Co. v. McCarter, 209 U.S. 349, 28 Sup. Ct. 529, 52 L. Ed. 828, 831, the Supreme Court of the United States said: "The boundary at which the conflicting interests cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or the farther side."

This court has not had occasion to write in a case involving facts which were the same or closely similar to the facts in this case. Some of our Courts of Civil Appeals have.

The case of Carpenters & Joiners Union v. Ritter's Cafe was

twice before the Galveston Court of Civil Appeals. The first appeal was from a judgment granting a temporary injunction against the Union, 138 S.W. 2d 223, and the second was from a judgment making the injunction permanent. 149 S.W. 2d 694. Ritter, who was the owner of a cafe employing union labor, contracted with one Plasterer, a contractor, for the erection of a building some twenty-four blocks removed from the cafe. Plaster employed nonunion men. The union, without negotiating with Plaster for the use of union labor, picketed the cafe, the pickets carrying a sign announcing that the owner had awarded a contract to Plaster who was unfair to the union. The cafe employees walked out and refused to cross the picket line. Deliverymen likewise refused to cross the picket line. The judgment awarding a temporary injunction was affirmed on the sole ground that picketing to compel a breach of contract with a third person was an unlawful purpose. The judgment awarding a permanent injunction was affirmed on the same ground on original submission. On rehearing the opinion gave the additional reason that the picketing was in violation of the antitrust laws of this state. This court refused a writ of error in the last appeal, thereby adopting the entire opinion as its own. The judgment was later affirmed by the Supreme Court of the United States, that Court recognizing that the union was violating Texas' antitrust laws in picketing a business "wholly outside the economic context of the real dispute" and thereby conscripting "neutrals" in the dispute.

. In Borden Co. v. Local No. 133, etc., Texas Civ. App., 152 S.W. 2d 828, the defendant union having a bona fide labor dispute with Borden Company, picketed the place of business of one Sam Person, a retailer who purchased milk from Borden Company for resale. The sign carried by the pickets announced: "This place is selling milk from dairies who locked out their employees." The trial court found that the union was not picketing Person's place of business as such, but was picketing "only the dairy products purchased by Person from the Borden Company." Nevertheless, the trial court enjoined the picketing and that judgment was affirmed by the Galveston Court of Civil Appeals, over the strong dissent of Associate Justice Cody, principally on the ground that the purpose of the picketing was within the inhibitions of our antitrust laws, both civil, Arts. 7426 and 7428, V.A.T.C.S., and penal, Arts. 1632, 1634 and 1635, and therefore unlawful. In the course of its opinion the court quoted with approval its statement in the Ritter case that no right of free speech is transcended by an injunction against picketing of a place of business to compel its owner to break a

contract which he has with a disassociated third person. This court refused a writ of error, thereby adopting the majority opinion as its own.

It may be said that the foregoing decisions rest primarily on the ground that the labor practices enjoined were in violation of the public policy of this state, as expressed in the statutes, to suppress trusts and conspiracies in restraint of trade. It may also be said, however, that they rest, in part at least, on the ground that the practices enjoined were violative of the public policy of this state against secondary boycotts and picketing of an employer with whom no dispute existed in order to force him to join with the union in applying coercive pressure on an independent employer with whom a dispute did exist, or, alternatively, to breach a contract or break off business relations with such employer.

The public interest involved in industrial strife in intrastate business cannot be greatly different from the public interest in industrial strife in interstate business. The Congress of the United States has declared coercive secondary labor practices in interstate business to be contrary to public policy and that declaration has been sustained by the Supreme Court of the United Sattes in three recent cases.

In 1951, the United States Supreme Court decided three cases involving 8(b) (4) (A) of the Labor-Management Relations Act of 1947, or the Taft-Hartley Act, 29 U.S.C.A. Secs. 151-166. This section of the Act makes it an unfair labor practice for a "labor organization or its agents * * * (4) to engage in, or to induce or encourage the employees of any employer to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor or manufacturer, or to cease doing business with any other person, * * *." In the case of National Labor Relations Board v. Denver Building & Construction Trades Council, et al, 341 U.S. 675, 71 Sup. Ct. 943, 95 L. Ed. 1284, it was held that an injunction was properly issued against union picketing of a construction project where the objective of the picketing was found to have been to force the general contractor

to cease doing business with a subcontractor. The court regarded the general contractor and the subcontractor as two separate employers and enterprisers "doing business" with each other. The signs carried by the pickets said simply: "This Job Unfair to Denver Building and Construction Trades Council." The National Labor Relations Board had found as a fact that the dispute was with the subcontractor and that the objective of the picketing was to force the general contractor to terminate the offending subcontract. Since a secondary boycott was thus clearly made out by the record before them, the court upheld the injunction saying that the congressional policy against the boycott was legitimate and that the free speech aspects of picketing had to yield where the objective of the picketing conflicted with the congressional policy.

International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 Sup. Ct. 954, 95 L. Ed. 1299, presenting an almost identical fact situation, produced a similar decision. The picketing was held properly banned where the union picketed a construction site to force one subcontractor to force the general contractor to cancel the subcontract of still another subcontractor with whom the picketing union had a dispute.

In Local 74, United Brotherhood Carpenters, etc. v. National Labor Relations Board, 341 U.S. 707, 71 Sup. Ct. 966, 95 L. Ed. 1309, a picketing injunction was upheld where the union picketed a construction site to force the owner of the project to cancel a contract with a subcontractor with whom the union was then engaged in a labor dispute.

In upholding a judicial declaration of public policy in the Hanke case the Supreme Court of the United States noted the fact that the policy so declared was in harmony with the public policy as declared by Congress. 94 L. Ed. 1003.

Respondent's contention that the trial court lacked jurisdiction cannot be sustained.

In the case of Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local No. 941 v. Whitfield Transportation, Inc. 154 Texas 91, 273 S.W. 2d 857, 860, this court, in declining to apply the rules announced in Garner v. Teamsters, etc. Union, 346 U.S. 485, 74 Sup. Ct. 161, 98 L. Ed. 228, wherein it was held that the Labor Management Relations Act had preempted for the appropriate Federal tribunals controversies of the type in-

volved in that case; this court said: "The Garner opinion observes with evidently studied purpose that in that case it did not appear 'that the Federal Board (NLRB) would decline to exercise its powers once its jurisdiction was invoked.' "

■ In the instant case the petitioner applied to the National Labor Relations Board for relief before suit was filed. The record reflects that on August 5, 1954, petitioner furnished the Board with interstate commerce data under case No. 16 showing that it was a Texas corporation engaged in the construction of commercial-type buildings exclusively within the State of Texas; that during the previous year it had purchased building material of the approximate value of $1,000,000 and that $250,000 of this amount was shipped to petitioner from places outside of Texas. On the same day charges were filed with the Board by petitioner against the respondent union. It is apparent from the record that the officials representing the NLRB were of the opinion that the evidence presented showed that the Board was without jurisdiction and that the petitioner was so advised. Petitioner withdrew the charges without prejudice and proceeded to file this suit for injunction in a state court of competent jurisdiction. Assuming without deciding the question that the above facts place the petitioner in the category of being a business engaged in interstate commerce, we are of the opinion that the National Labor Relations Board's action in declining informally to take jurisdiction was correct. It would seem that it would have been a useless procedure to have required the petitioner to prosecute its charges to a final and formal decision by the Board. Under the circumstances it was justified in presenting its complaint and seeking its remedy in the state courts.

By sworn motion of respondent it is made to appear that following the decision by the Court of Civil Appeals the parties entered into an agreement of settlement of their controversy under the terms of which respondents withdrew their pickets and petitioner signed a contract governing future relations of the parties. Copies of both instruments are attached.

The contract operates prospectively and provides that petitioner will itself pay union wages and observe union hours and working conditions and that any subcontractor engaged to perform work covered by the agreement shall assume all the terms and conditions of the agreement.

The settlement agreement provided that it should be with-

out prejudice to the rights of either party to pursue the appeal to any court. It stated the basic issue between the parties to be as follows:

"Do the constitutional provisions vouchsafe the right of a teamsters' union, which is interested in securing contracts prescribing union wages and working conditions for truck drivers engaged in transporting building materials, to picket peacefully the construction site of a building contractor, although such contractor does not employ truck drivers but has building materials delivered to his site by subcontractors who employ union and nonunion truck drivers, and where there is no complaint from the employees of the general contractor or his subcontractors as to wages, hours or working conditions?"

It then provided that if the final judicial answer to the question should be in the negative petitioner would have the right to terminate the contract on fifteen days' notice.

■ The settlement agreement and contract give rise to a contention by respondent that the case is moot and should be dismissed. We do not agree with this contention. The agreement was without prejudice to the right of either party to prosecute the appeal. This type of agreement should be encouraged. The picketing ceased not because the case had been settled, but because the parties had entered into the agreement without prejudice to the right of petitioner to prosecute the appeal.

■ Ordinarily the sole question before an appellate court in an appeal from a judgment granting or denying a temporary in-injunction to preserve the status quo pending a hearing on the merits is whether the trial court abused its discretion. Respondents' contention that a different rule should be applied in this case because the temporary injunction accomplishes the whole object of the suit and their rights are thereby determined without a trial cannot be sustained. There is no showing that respondents sought and were denied a prompt and speedy trial on the merits. In the absence of such a showing respondents are not in position to urge that their rights have been finally determined without a trial. Texas Foundaries v. International Moulders, 151 Texas 239, 248 S.W. 2d 460.

■ The judgment of the Court of Civil Appeals will be reversed and the injunction issued by the trial court will be reinstated.

Respondents contend that the injunction is too broad and

that it should be modified. The courts have modified broad injunctions against picketing in some cases. Construction and General Labor Union v. Stephenson, supra; Texas Federation of Labor v. Brown & Root, Texas Civ. App., 246 S.W. 2d 938, writ refused, N.R.E. In other cases we have reached the same result by defining in our opinion the conduct we regarded as being prohibited by the injunction. North East Texas Motor Lines v. Dickson, 148 Texas 35, 219 S.W. 2d 795, 11 A.L.R. 2d 1055. The latter approach was used by a majority of the Supreme Court of the United States, over the objection of the minority, in International Brotherhood v. Hanke, supra. No injunction which prohibits lawful picketing may stand; only unlawful picketing may be enjoined. What we have said in this opinion will serve to indicate to the trial court the extent to which we have held the conduct of respondents to be unlawful. In this connection it is well to state that we have not given an unequivocal answer to the question which the parties agreed was the basic question in the case. We are not at liberty to answer abstract questions, but must confine ourselves to passing on the issues which are brought forward by the record.

■ To narrow our holding to the facts in this case, it may be said to be this: In so far as the picketing of petitioner's construction project is for the purpose of coercing petitioner to force subcontractors to pay union wages and observe union hours and working conditions, or, alternatively, to breach its contracts with the subcontractors, there being at the time the contracts with the subcontractors were entered into no contract between petitioner and respondent union that all subcontractors would be required to assume the obligations of paying union wages and observing union working conditions, the picketing is contrary to the public policy of this state and unlawful. It is unnecessary for us to decide whether picketing of petitioner would be unlawful if it was for the sole purpose of inducing petitioner to sign the type of contract it did sign relating to future subcontracts.

The judgment of the Court of Civil Appeals is reversed and the temporary injunction granted by the trial court is reinstated.

Opinion delivered January 4, 1956.

Rehearing overruled February 8, 1956.