**Glen LLOYD and KDFW–TV, Inc., Appellants,**

v.

**ALASKA WORLDWIDE, INC., d/b/a Wilson International, Appellee.**

No. 19261.

Court of Civil Appeals of Texas, Dallas.

March 31, 1977.

Donald L. Case, J. Kyle DuVall, T. Michael Wilson, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, for appellants.

David Westfall, Bailey, Williams, Westfall, Lee & Fowler, Dallas, for appellee.

AKIN, Justice.

This is an appeal from a temporary injunction granted appellee-plaintiff, Alaska Worldwide, Inc., doing business as Wilson International, enjoining appellants, Glen Lloyd and his employer, KDFW–TV, Inc., the owner of a television station, from broadcasting stories which interfere with plaintiff's business, from communicating with plaintiff's employees, from going about plaintiff's place of business, from doing any acts calculated to harass or injure plaintiff's business, and from harming or destroying any materials in defendants' possession. Because we hold that the injunction violates the Texas and United States Constitutions and that it is unsupported by the evidence, we dissolve the injunction.

As part of KDFW's news broadcasts, Lloyd presents "Action Four," a program designed to assist consumers with complaints and questions, both of which the program solicits. After receiving complaints about Wilson International, a "job-search" firm engaged in the business of preparing resumes and providing names of prospective employers for persons interested in overseas employment, Lloyd produced two segments of "Action Four," each lasting two minutes, which were broadcast on February 1 and 2, 1977. In these programs, Lloyd stated that two Wilson International clients claimed that a Wilson International employee made misrepresentations to them. Essentially, these clients asserted that the employee of Wilson International guaranteed that Wilson International would locate for them highly paid positions with substantial fringe benefits in Arab countries. Instead, a written contract between the client and Wilson International provided that the client would be responsible for contacting prospective employers. Each client only received mailing lists of prospective employers and copies of resumes. Some of these prospective employers were no longer in business. The evidence indicates that it was rare, if ever, that Wilson International clients secured jobs as attractive as promised. For these services, clients paid up to $450 upon signing the contract. Lloyd also stated on television that Wilson International had refunded one client's money voluntarily and that it had refunded the other client's money after "Action Four" became involved. At one point, Lloyd referred to one of these people as having been "ripped-off." Another segment of the telecast also included a quote from Joe Wilson, president of Wilson International, that he appreciated having the complaints called to his attention "because we want to run a good business, and we want to treat people fairly." After these broadcasts, Lloyd received additional complaints concerning Wilson International which he forwarded to Wilson at Wilson's request.

■ Wilson International's attorney, in oral argument, conceded, and the record reflects, that there was no evidence that Lloyd made any false statements in the broadcasts. However, he contends that the injunction was proper because of Lloyd's motive in broadcasting the story, which appellee characterized as malicious and as a deliberate attempt to harm the business as indicated by Lloyd's use of the term "ripped-off." We cannot agree that freedom of speech and freedom of the press are limited to those with the purest of motives. Section 8 of Article I of the Texas Constitution states:

Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. . . .

The Texas Supreme Court, in *Ex parte Tucker*, 110 Tex. 335, 220 S.W. 75, 76 (1920), held that this section prohibits a court from limiting what a person may say of another. In so holding, the court stated:

The purpose of this provision is to preserve what we call "liberty of speech" and "the freedom of the press," and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom. Responsibility for the abuse of the privilege is as fully emphasized by its language as that the privilege itself shall be free from all species of restraint. But the abuse of the privilege, the provision commands, shall be dealt with in no other way. It is not to be remedied by denial of the right to speak, but only by appropriate penalties for what is wrongfully spoken.

It has never been the theory of free institutions that the citizen could say only what courts or legislatures might license him to say, or that his sentiments on any subject or concerning any person should be supervised before he could utter them. Nothing could be more odious, more violative or destructive of freedom, than a system of only licensed speech or licensed printing. . . .

Let it once be admitted that courts may arrogate the authority of deciding what the individual may say and may not say, what he may write and may not write, and by an injunction writ require him to adapt the expression of his sentiments to only what some judge may deem fitting and proper, and there may be readily brought about the very condition against which the constitutional guaranty was intended as a permanent protection. Liberty of speech will end where such control of it begins.

For these reasons the court held that prior restraint of false and defamatory statements are prohibited under Article I, section 8. We cannot conceive that any less protection should be afforded to statements which, on the record before us, must be regarded as true.

The supreme court notes, however, that speech may be restrained in extreme situations:

Equity will protect the exercise of natural and contractual rights from interference by attempts at intimidation or coercion. Verbal or written threats may assume that character. When they do, they amount to conduct, or threatened conduct, and for that reason may properly be restrained.

*Id.* We find here no evidence of the kind of intimidation or coercion that may be subject to restraint. Obviously, any publication of an unflattering nature may "intimidate" or "coerce" an individual to change or rectify the behavior which is reported if the publication has adverse business or social effects. Such an effect does not, in itself, remove its constitutional protection. "Threat," in law, means "an expression of an intention to inflict loss or harm on another by illegal means, especially when effecting coercion or duress of the person threatened." Webster's New Internat'l Dictionary, p. 2633 (2d ed. unabr. 1941); *see McMorries v. Hudson Sales Corp.,* 233 S.W.2d 938, 940 (Tex.Civ.App.—El Paso 1950, no writ). Wilson International has failed to show that any contemplated acts of Lloyd or KDFW–TV are in any way illegal. The supreme court in *Tucker* did not intend that any statement which may coerce another should be subjected to injunction. The coercion must be by verbal or written statements that the defendant will perform illegal acts harmful to the plaintiff. We have found no case in which the Texas Supreme Court has approved an injunction on this basis.[1] In light of the broad language of *Tucker* regarding the liberty of speech and freedom of the press, we conclude that the exception is to be drawn narrowly and that an injunction should issue only in the most compelling

---

1. The injunctions which were sustained against attacks based on Art. I, § 8, in *Carpenters Local 213 v. Ritter's Cafe,* 149 S.W.2d 694 (Tex. Civ.App.—Galveston 1941, writ ref'd) and *Dallas General Drivers v. Wamix, Inc.,* 156 Tex. 408, 295 S.W.2d 873 (1956) are distinguishable because they were directed at picketing, which is subject to greater restriction than pure speech. *American Radio Ass'n v. Mobile Steamship Ass'n, Inc.,* 419 U.S. 215, 229–30, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974); *see Cain, Brogden & Cain, Inc. v. International Brotherhood of Teamsters, Local 47,* 155 Tex. 304, 285 S.W.2d 942, 948 (1956).

circumstances. Wilson International's contention that the broadcasts were malicious and were intended to harm its business obviously does not come within this narrow exception. Indeed, this court, in affirming a denial of a temporary injunction, speaking through Chief Justice Guittard in *Dallas Oil and Gas, Inc. v. Mouer*, 533 S.W.2d 70, 74 (Tex.Civ.App.—Dallas 1976, no writ), stated:

> The petition alleges that plaintiffs have been damaged by false and defamatory statements in the press, but it does not state grounds for a temporary injunction because injunctive relief is not available as a prior restraint of defamatory publications, however false and however damaging. Such a prior restraint would in itself violate the guarantees of freedom of speech and freedom of the press in Texas Constitution, article I, section 8.

■ Similarly, the injunction violates the First Amendment of the U. S. Constitution, as applied to the states through the Fourteenth Amendment. In *Near v. Minnesota*, 283 U.S. 697, 713, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931), the U. S. Supreme Court condemned a prior restraint of "scandalous and defamatory" publications concerning public officials, which were not attacked as false, as "the essence of censorship." The fact that the defendant in *Near* could have availed himself of the defense that "the charges are true and are published with good motives and for justifiable ends" did not overcome the injunction's constitutional deficiency. In *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418–19, 91 S.Ct. 1575, 1578, 29 L.Ed.2d 1 (1971), the Court rejected the idea that coercion alone would take speech out of the First Amendment, saying: "No prior decisions support the claim that the interests of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court." Thus, consumers have a right to publicize business practices of which they disapprove. *Concerned Consumers League v. O'Neill*, 371 F.Supp. 644, 648–49 (E.D. Wis.1974); *see Stansbury v. Beckstrom*, 491 S.W.2d 947, 948 (Tex.Civ.App.—Eastland

1973, no writ). This right, of course, may be exercised by the media in the interest of the public.

■ The injunction also enjoins defendants from going about Wilson International's place of business, communicating with its employees and officers, or doing any acts calculated to harass or injure its business. There are situations in which such an injunction would be justified. *E. g., Florence v. Florence*, 388 S.W.2d 220, 222 (Tex.Civ.App.—Tyler 1965, writ dism'd); *Dickson v. Dickson*, 516 S.W.2d 28, 30 (Tex. Civ.App.—Austin 1974, no writ). However, before such an injunction is proper, there must be some showing of conduct directed toward the plaintiff from which he is entitled to be free. Here, Lloyd went to Wilson International's office for the purpose of interviewing an employee and left voluntarily after the interview was denied. He conducted an interview with Joe Wilson, president of Wilson International, and forwarded complaint letters to Wilson International, both at Wilson's request. He placed a telephone call requesting information concerning Wilson International's business and the number and disposition of the complaints received. There is evidence that he told a Wilson International employee that he would solicit this information from Wilson International's clients in a broadcast if it was not supplied. Lloyd also suggested that dissatisfied clients file complaints with various official agencies, which was done. These actions, taken alone or in concert, are not the type of conduct that may be enjoined. Likewise, the record does not show any contemplated conduct by appellants that would be enjoinable. The appellant's investigation of the story did not produce the adverse effects on Wilson International's business; instead, it was the information they received and broadcast which produced the adverse effects. As we have held, the injunction on the contents of the broadcasts is void. We also hold that the part of the injunction prohibiting appellants from going about Wilson International's place of business or contacting officers or employees of Wilson International cannot stand.

The injunction also prevented defendants from harming or destroying any materials in their possession. The record is devoid of any indication that defendants have any intention of harming or destroying any material. Since injunctions are issued only to prevent imminent harm, this part of the injunction was also improper. *Luccous v. J. C. Kinley Co.*, 376 S.W.2d 336, 341 (Tex.1964).

Injunction dissolved.