The STATE of Texas, Appellant,

v.

ALLIED MARKETING GROUP, INC., Audio Telecom, Inc., Credicorp, Inc. (Formerly Fafco, Inc.), and Stevan A. Hammond, Appellees.

No. 05–96–00075–CV.

Court of Appeals of Texas, Dallas.

July 17, 1997.

Craig Jordan, Assistant Attorney General, Dallas, for Appellant.

William M. Parrish, Jenkens & Gilchrist, P.C., Austin, David F. Bragg, Bragg Chumlea McQuality Smithers & Curry, Austin, for Appellees.

Before KINKEADE, WHITTINGTON and WRIGHT, JJ.

## OPINION

WHITTINGTON, Justice.

In this appeal, we must decide whether appellees [1] violated the Texas Consumer Credit Code by charging an annual fee in connection with a program known as the "Gold Card program." After the parties entered a partial settlement agreement, the issue was submitted to the trial court on cross-motions for summary judgment. The trial court, after reviewing the summary judgment evidence and hearing the arguments of counsel, granted appellees' partial summary judgment motion and denied the State's motion. For the reasons set forth below, we reverse the trial court's judgment and render judgment that the charging of an annual fee in connection with the Gold Card program violates article 5069–6.03(8) of the

1. Appellees include Allied Marketing Group, Inc., Audio Telecom, Inc., Credicorp, Inc. (formerly FAFCO, Inc.), and Stevan A. Hammond.

consumer credit code. We remand this cause to the trial court for entry of judgment consistent with the parties' partial settlement agreement.

## BACKGROUND

Credicorp, Inc., a Texas corporation established in November 1990, operates a nationwide mail-order business. Since its inception, Credicorp has been in the business of selling merchandise through catalogue sales to "members." [2] Credicorp solicits potential members using a "Gold Card" promotion. As part of the promotion, Credicorp sends solicitations to potential customers advising them (1) they have been pre-approved for a "Gold Card" with a $10,000 line of credit; and (2) for a $29.95 annual fee, they have the right to make purchases from Credicorp's catalogue of merchandise. In exchange for the annual fee, a member receives (1) a gold "credit card" with the customer's name and identification number; (2) the right to make purchases from Credicorp's catalogue, either in cash or on credit; and (3) the right to obtain various discount travel and entertainment packages.

The summary judgment evidence shows that for a Gold Card member to make a purchase on credit, the member must provide his account number to Credicorp and sign an individual "closed-end" credit agreement. Under the agreement, the member agrees to pay for the item purchased under a predetermined schedule, providing for fixed payments over a specified period of time. The summary judgment evidence establishes that, as long as a member follows Credicorp's rules and regulations, he has the right to make further purchases up to the $10,000 credit limit. However, each purchase requires the member to execute a new, "closed-end" credit agreement. Credicorp characterizes the "closed-end" credit agreement as a retail installment contract.

In July 1992, the State of Texas filed suit against appellees alleging, among other things, that charging the $29.95 annual fee in connection with the Gold Card program violated article 5069-6.03(8) of the Texas Consumer Credit Code.[3] During the course of the lawsuit, the parties settled all claims between them except the one based on the consumer credit code. Accordingly, one issue remained for trial: whether the charging of an annual fee in connection with the Gold Card program violated article 5069-6.03(8) of the consumer credit code.

In the State's summary judgment motion, it argued that (1) article 5069-6.03(8) of the consumer credit code prohibited the charging of an annual fee in connection with a retail charge agreement, and (2) Credicorp's Gold Card program constituted a retail charge agreement. Credicorp responded to the motion by filing a response and a cross-motion for partial summary judgment. In its cross-motion, Credicorp argued it was entitled to judgment as a matter of law because (1) the Attorney General lacked authority to prosecute this action under the consumer credit code, and (2) the Gold Card program was not a retail charge agreement as that term is defined in the code.

The trial judge held a hearing on the motions in May 1995. After reviewing the summary judgment record and hearing the arguments of counsel, the trial judge agreed with Credicorp that the code did not prohibit the charging of an annual fee in connection with the Gold Card program. Accordingly, the trial judge granted Credicorp's motion and denied the State's motion. Then, pursuant to the parties' settlement agreement, the trial judge entered a "Modified Final Judgment and Order." [4] The modified judgment incorporated the terms of the trial court's sum-

---

2. The evidence indicates that, with just a few unrelated exceptions, only members can purchase items from Credicorp's catalogue.

3. The suit was also brought under the Texas Deceptive Trade Practices–Consumer Protection Act to prevent appellees from engaging in various false, misleading, or deceptive practices in connection with their mail-order business.

4. The settlement agreement stated that if the trial judge found the annual fee did *not* violate the consumer credit code, the court would enter the court's earlier Agreed Interlocutory Judgment and Order as an Agreed Final Judgment and Order. The trial judge did so, but captioned the final judgment as a *Modified* Final Judgment and Order.

mary judgment order and ordered that the State take nothing on its claims based on the consumer credit code. This appeal followed.

## STANDARD OF REVIEW

When reviewing a summary judgment, this Court applies the following standards:

(1) The movant for summary judgment has the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law.

(2) In deciding whether a disputed fact issue exists precluding summary judgment, we take evidence favorable to the nonmovant as true.

(3) We indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor.

*Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex.1985).

■ To prevail on summary judgment, a plaintiff must conclusively establish all elements of its cause of action as a matter of law. *Nationwide Property & Casualty Ins. Co. v. McFarland*, 887 S.W.2d 487, 490 (Tex. App.—Dallas 1994, writ denied); *see* TEX.R. CIV. P. 166a(c). For a defendant as movant to prevail on summary judgment, it must either (1) disprove at least one element of each of the plaintiff's theories of recovery or (2) plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979); *Hoover v. Gregory*, 835 S.W.2d 668, 671 (Tex. App.—Dallas 1992, writ denied). A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence. *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 446 (Tex.1982).

■ The purpose of the summary judgment rule is not to provide a trial by deposition or affidavit. Rather, the purpose of the rule is to provide a method of summarily ending a case that involves only a question of law or no genuine issue of fact. *Gaines v. Hamman*, 163 Tex. 618, 358 S.W.2d 557, 563 (1962); *Port Distrib. Corp. v. Fritz Chem.*

*Co.*, 775 S.W.2d 669, 670 (Tex.App.—Dallas 1989, writ dism'd by agr.). The rule is not intended to deprive litigants of their right to a full hearing on the merits of any real fact issue. *See Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (1952). When, as here, both sides move for summary judgment and one party's motion is granted and one is denied, we determine all questions presented and render the judgment the trial court should have rendered. *Jones v. Strauss*, 745 S.W.2d 898, 900 (Tex.1988).

## ANNUAL FEE

In its sole point of error, the State contends the trial judge erred in granting appellees' summary judgment motion and denying the State's motion because the summary judgment evidence conclusively established (1) the Gold Card program was a retail charge agreement for purposes of the consumer credit code, and (2) the charging of an annual fee in connection with that program was therefore prohibited under the code. Appellees raise two arguments in response: (1) the Attorney General lacked authority to bring this suit on behalf of the State; and (2) summary judgment was proper because the evidence conclusively established the annual fee was not prohibited under the code. After reviewing the record in this case, we cannot agree with appellees on either point.

■ We turn first to appellees' argument that summary judgment was proper because the Attorney General lacked authority to prosecute this action under the consumer credit code. Under this point, appellees argue that (1) the Attorney General's office is one of limited powers; and (2) absent a referral by the Consumer Credit Commissioner, the Attorney General is not authorized to prosecute an action for violation of the consumer credit code. The State responds that this issue is outside the scope of this appeal because the parties, in their partial settlement agreement, limited the scope of the appeal to a single question: whether the Gold Card program violated the consumer credit code. We agree with the State.

As noted previously, the parties in this case entered into a partial settlement agree-

ment purporting to settle all issues between them except the question of whether the annual fee violated the consumer credit code. In the agreement, the parties stated that (1) the purpose of the agreement was to resolve all disputes except for the allegations regarding alleged violations of the consumer credit code, and (2) the issue of whether the Gold Card program violated the consumer credit code would be submitted to the trial court for resolution. The parties then agreed that either party could appeal the trial court's finding that "the annual fee charged in connection with Credicorp, Inc.'s Gold Card program violates or does not violate the Credit Code."

The parties did not contemplate, nor did they agree, that any other issue could be raised in connection with the trial court's ruling. Because the parties limited the scope of any appeal to the single issue of whether the annual fee violated the consumer credit code, we conclude appellees are precluded from arguing on appeal that the Attorney General lacked authority to prosecute this action.[5]

■ Turning to the question of whether the annual fee violated the provisions of the consumer credit code, we look first to the language of article 5069–6.03(8), which states that "[n]o annual, membership, or participation fee shall be charged to or collected from a retail buyer *in connection with a retail charge agreement.*" Tex.Rev.Civ. Stat. Ann. art. 5069–6.03(8) (Vernon Supp. 1997) (emphasis added). The statute defines "retail charge agreement" as:

> . . . an instrument or instruments prescribing the terms of retail installment transactions which may be made thereunder from time to time (whether secured or unsecured), and under the terms of which a time price differential, as defined in this Article, is to be computed in relation to the buyer's unpaid balance from time to time.

*The term includes an instrument or instruments prescribing the terms of a retail credit card arrangement.*

Tex.Rev.Civ. Stat. Ann. art. 5069–6.01(g) (Vernon 1987) (emphasis added). During oral argument, the State conceded that the Gold Card program did not fall within the first portion of this definition. Rather, the State relies exclusively on the second portion of the definition, arguing that the Gold Card program constitutes a "retail credit card arrangement" and, thus, falls within the definition of "retail charge agreement." We agree with the State.

Article 5069–6.01(p) of the revised civil statutes defines "retail credit card arrangement" as:

> . . . an arrangement, payable in one or more installments, pursuant to which a retail seller or credit card issuer gives to a retail buyer or lessee the privilege of using a credit card for the purpose of purchasing or leasing goods or services from that person, a person related to that person, others licensed or franchised to do business under his business or trade name or designation, or other persons authorized to honor the card. The term does not include arrangements operated pursuant to any other Chapter of this Title.

Tex.Rev.Civ. Stat. Ann. art. 5069–6.01(p) (Vernon 1987). A reading of the statutory language indicates that three requirements must be met for a particular arrangement to constitute a "retail credit card arrangement": (1) it must be payable in one or more installments; (2) it must be between a retail seller or credit card issuer and a retail buyer or lessee; and (3) it must involve use of a credit card for purposes of purchasing or leasing goods or services from the retail seller/credit card issuer or someone authorized to accept the card.

Here, the parties agree that the Gold Card program meets the first two requirements.

---

**5.** We note that appeals under these circumstances, where the parties agree to limit the issues on appeal, have been allowed in the past. *See Ruiz v. Conoco, Inc.*, 868 S.W.2d 752, 754 & n. 1 (Tex.1993) (op. on reh'g); *Cain, Brogden & Cain, Inc. v. Local Union No. 47*, 155 Tex. 304, 285 S.W.2d 942, 950–51 (1956); *Trinity Universal Ins. Co. v. Cowan*, 906 S.W.2d 124, 128 (Tex.App.—Austin 1995), *rev'd on other grounds*, 945 S.W.2d 819 (Tex.1997); *cf. First Nat'l Bank v. Kinabrew*, 589 S.W.2d 137, 142–43 (Tex.Civ. App.—Tyler 1979, writ ref'd n.r.e.) (refusing to limit issues on appeal because, although parties executed stipulation appearing to limit case to single issue, neither parties nor court treated agreement as limiting issues to be tried).

However, they disagree on whether the program gives buyers the privilege of *using* a credit card to purchase goods and, thus, whether the program falls within the statutory definition. Accordingly, we must decide whether Credicorp's members *use* the Gold Card to purchase goods from Credicorp.

This appears to be a case of first impression in this State. We have found no cases, and the parties have cited us to none, which interpret the particular statutory provisions here at issue. Nevertheless, appellees contend that Credicorp members do not *use* the Gold Card, as that term is used in the statute, because they do not charge items to a pre-existing account when making purchases; instead, they sign individual closed-end credit agreements. According to appellees, because a member's purchases are not applied to a pre-existing account, the Gold Card is nothing more than a membership card and, thus, is not "used" by members as required by the statute. The State counters that members do in fact *use* the Gold Card when making purchases because they cannot make a purchase without first providing the account number appearing on their card. Because purchases can only be made when the account number is provided, the State maintains the card is *used* for purposes of purchasing items from Credicorp.

Webster's Ninth New Collegiate Dictionary defines "use" as "the act or practice of employing something," or "to put into action or service: avail oneself of." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1299 (9th ed.1985). Likewise, Black's Law Dictionary defines the term "use" as "to employ; to avail oneself of" or "to carry out a purpose or action by means of; to put into action or service, especially to attain an end." BLACK'S LAW DICTIONARY 1541 (6th ed.1990). Here,

the summary judgment evidence shows that to purchase an item from Credicorp, a member must first fill out an order form *using* the identification number on the Credicorp Gold Card. It is undisputed that Credicorp will not process an order without a member's account number on the form. In fact, the summary judgment evidence establishes that an order cannot be entered into Credicorp's system without the account number. The account number is obtained from the face of the Gold Card. Because a purchase can only be made by including the account number appearing on the Gold Card, we conclude that Credicorp members "employ" or "put [the Gold Card] into action" when "attaining" the desired "end" of making a purchase. Accordingly, we conclude Credicorp members *use* the Gold Card to make purchases from Credicorp.[6]

■ In reaching our decision, we necessarily reject appellees' argument that the Gold Card is nothing more than a "membership" card and, thus, does not fall within the statutory definition. Appellees liken the Credicorp Gold Card to other membership cards such as those issued by Hertz, Sam's Club, and the State Bar of Texas. However, one major distinction exists between those cards and the Gold Card issued by Credicorp—the Credicorp Gold Card provides its holder with a $10,000 line of credit. The others do not.[7] The summary judgment record indicates unequivocally that, as long as a member is in good standing, he has the absolute right to make purchases from Credicorp up to the $10,000 limit. This is not true of the other cards used by appellees for comparison purposes. Because the Credicorp Gold Card provides its cardholders with a pre-existing account and line of credit to which they have unlimited access (up to $10,-

6. This situation is no different from the situation where a person uses a Visa or Mastercard to purchase something over the telephone. When such a purchase is made, the cardholder simply relays his or her account number to the merchant and the merchant bills the cardholder's account. The actual card is never produced. Although appellees would have us distinguish the Gold Card from this situation because the Gold Card, unlike a Visa or Mastercard, does not include a "pre-existing account," we disagree. While Gold Card members may be given separate payment books and schedules for each individual purchase made from Credicorp, they neverthe-

less have a "pre-existing account" because they have a right to make purchases up to $10,000 and Credicorp checks the member's existing balance when processing orders to determine whether the member has exhausted the line of credit.

7. The summary judgment evidence indicates that neither a Hertz card, Sam's card, or State Bar card gives its holder the right to obtain credit on the card. Rather, when purchases are made, some other form of payment (*i.e.*, cash or third-party credit card) must be used.

000 as long as they are in good standing), we conclude the card is a credit card rather than a membership card. We reject appellees' arguments to the contrary.

For the reasons stated, we conclude Credicorp's Gold Card program meets the statutory definition of a "retail credit card arrangement." As such, it falls within the statutory definition of "retail charge agreement."[8] The charging of an annual fee in connection with such an agreement is prohibited by article 5069–6.03(8) of the consumer credit code, and we conclude the trial judge erred in concluding otherwise. We sustain the State's sole point of error. We reverse the trial court's judgment and render judgment that the charging of an annual fee in connection with the Gold Card program violates article 5069–6.03(8). We remand this cause to the trial court for entry of judgment consistent with the parties' partial settlement agreement.

---

8. Appellees argue that we should not conclude from the statutory language that all "retail credit card arrangements" are necessarily "retail charge agreements" because the same exact language appears in the definition of "retail installment transactions." We do not agree. The phrase "retail installment transaction," as used in the code, defines a broad class of transactions which includes not only "retail charge agreements" but also "retail installment contracts." *See* TEX.REV.CIV. STAT. ANN. art. 5069–6.01(e) (Vernon Supp.1997). The inclusion of the sentence relating to "retail credit card arrangements" simply makes clear that they too are "retail installment transactions" as that term is defined in the code. Contrary to appellees' contention, our interpretation does not mean that all "retail installment transactions" are necessarily "retail charge agreements" because the phrase "retail installment transaction" also includes "retail installment contracts" and that term does not include transactions prescribing the terms of a "retail credit card arrangement." *See* TEX.REV. CIV. STAT. ANN. art. 5069–6.01(f) (Vernon 1987).